**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-00152-PAB-STV

JOHN DOE,

    Plaintiff,

v.

UNIVERSITY OF DENVER, et al.

    Defendants.

---

## DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

---

Defendants University of Denver, University of Denver Board of Trustees, Rebecca Chopp, Kristin Olson, Jean McAllister, Kathryne Grove, and Eric Butler (collectively "Defendants" or "DU") hereby move to exclude the expert testimony of Aya Gruber and Hanna Stotland. As grounds for this Motion, Defendants state as follows:

### I. INTRODUCTION

Aya Gruber opined on the substantive and procedural aspects of DU's investigation into Jane Doe's complaint against Plaintiff John Doe, and DU's ultimate finding that Plaintiff violated its non-consensual sexual-assualt policy. Specifically, Gruber states the following five opinions in her report:

- DU did not "complete a fair and thorough investigation." (Attached as Exhibit 1, Gruber Report at 6-10, 23.)

- DU investigators made flawed and disparate credibility determinations. (*Id.* at 10-16.)

- DU based its assessment of the facts on "natural" sexual relations and gender stereotyping. (*Id.* at 16-18.)

- DU "failed to adequately analyze the substantive legal standard for coercion." (*Id.* at 18-22, 23.)

- DU investigators misinterpreted and misapplied the preponderance of the evidence standard. (*Id.* at 22–23.)

Plaintiff engaged Hanna Stotland to provide her expert opinions concerning the consequences to Plaintiff due to his expulsion from DU. Specifically, Stotland states the following opinions in her report:

- Defendants' finding of responsibility against Plaintiff for sexual assault and his dismissal from DU places a significant, negative burden on Plaintiff's prospects for future education and employment. (Attached as Exhibit 2, Stotland Report at 3.)

- Plaintiff has struggled socially, feels disconnected at DePaul (where he is currently enrolled) and suffers from a loss of confidence. (*Id.* at 4.)

- Plaintiff "will require a significant expenditure of money and time over and above what most law school applicants must invest" due to having to self-disclose that he was responsible for non-consensual sexual activity. (*Id.*)

- Plaintiff will encounter impediments in the character and fitness process of any state bar exam without professional help. (*Id.* at 5–6.)

Defendants respectfully request that the Court preclude both Gruber and Stotland from offering expert opinions, for the reasons discussed below.

## II. STANDARD OF REVIEW

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

2

>on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of the expert must demonstrate by a preponderance of the evidence that the expert's testimony and opinion is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008). In determining whether expert testimony is admissible, the Court must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. *Nacchio*, 555 F.3d at 1241. If the expert is sufficiently qualified, the court must determine whether the expert's opinion is sufficiently "relevant to the task at hand," such that it "logically advances a material aspect of the case," *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884, 884 n.2 (10th Cir. 2005), and reliable under the principles set forth in *Daubert*. *103 Inv'rs I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006); *see also United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)) ("Rule 702 imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"). "Ultimately, the Court must determine whether the expert's opinion would assist the trier of fact in understanding or determining a fact at issue in the case." *King v. Allstate Ins. Co.*, No. 11-cv-00103, 2013 WL 3943607, at *1 (D. Colo. July 31, 2013).

### III.   ARGUMENT AND ANALYSIS

#### A. Aya Gruber is Not Qualified as an Expert in Title IX Investigations and Proceedings.

Gruber lacks the requisite knowledge, training, and experience to be qualified as an expert in Title IX investigations and proceedings. Gruber's undergraduate degree is Philosophy. She

3

received her Juris Doctorate, but has no other advanced degrees or formal education. Following law school, Gruber's only professional experience involved litigating criminal cases. (Attached as Exhibit 3, Gruber CV at 10.) Since entering academia, Gruber's area of scholarship and teaching is focused on criminal law.[1] Not one of Gruber's publications concerns sexual-assault investigations on a college campus or Title IX proceedings.[2]

Gruber has no experience or expertise in the area she is offered as an expert: how to conduct a sexual-assault disciplinary investigation on a college campus. Gruber has never held the role of Title IX coordinator at any college or university. She has never been involved in a single campus sexual-misconduct case as an investigator or a decision-maker. In addition, Gruber has never interviewed a victim of sexual assault or conducted a sexual-assault investigation. (Attached as Exhibit 4, Gruber Colgate Dep. Tr. at 27:4-14.) In a recent Title IX case, in which Aya Gruber was engaged as an expert, the court examined her knowledge, skill, experience, training, and education, and concluded that she was not qualified to render an expert opinion concerning a university's investigative techniques or other aspects of the Title IX investigation. *Doe v. Colgate Univ.*, No. 15-cv-1069, 2017 WL 4990629, at *10 (N.D.N.Y. Oct. 31, 2017) ("[Aya Gruber] has

---

[1] Of the seven courses Gruber regularly teaches, six of them are focused on criminal law (she also teaches torts). Gruber categorizes her areas of research as: "Substantive Criminal Law, Criminal Procedure, Feminism, Critical Race Theory, Critical Legal Studies, Comparative Criminal Law and Procedure." (Exhibit 3, Gruber CV at 1.)

[2] In her eleven-page resume, Gruber lists only three instances in which she spoke on Title IX, none of which is related to Title IX investigations of a student: (1) Conference Presentation, Anti-Rape Culture, NY, New York January 2016 (Invited) Presented article at the AALS "hot topic" panel on Title IX; (2) Panelist, Title IX and Campus Rape Policy Reform, Cambridge, MA September 2014 (Invited) Presented talk and participated in panels at Harvard Law School "teach-in"; (3) REASON, "Law Professors Against Title IX" (Media Commentary 2014-16).

never conducted an investigation of an alleged sexual assault, attended a Title IX training, or served as a Title IX investigator.") (Attached as Exhibit 5, Colgate Decision).

Further, Gruber's lack of familiarity with student-conduct proceedings is evident. Indeed, Gruber's entire analysis of the investigative report stems from a criminal-law perspective. Gruber begins her report with a historical recounting of "rape laws." (Exhibit 1, Gruber Report at 3.) In explaining DU's "flawed analysis of the substantive law," Gruber utilizes the standard of liability in criminal and civil law. (*Id.* at 18.) Her report is replete with criminal law terms and standards:

- "Basic substantive criminal and civil law principles dictate that a defendant cannot be liable for the undisclosed intentions of the victim, but he must have intent regarding whether or not the person felt pressured." (*Id.* at 5.)

- "The basic dictates of substantive due process do not allow for a coercion policy so vague that liability can be determined simply by an investigator's gut feeling." (*Id.* at 6.)

- "Rape-shield laws prevent criminal juries from hearing certain evidence of complainants' past sexual conduct because such evidence may prejudice jurors and lead them to acquit despite evidence that sex was coerced." (*Id.* at 17.)

- "A basic rule of statutory interpretation is that the reader should give meaning to every word in the statute." (*Id.* at 19.)

- "[T]he investigators rendered the policy **unconstitutionally** vague, that is, unable to provide sufficient notice to the public as to the conduct prohibited." (*Id.* at 21) (emphasis added).)

- "The investigators appeared to be unaware that for one to be civilly or criminally liable, the person must, in addition to performing the prohibited act, intend the prohibited conduct." (*Id.*)

Gruber admits in her deposition that in terms of best practices for conducting examinations of witnesses and the overall investigation itself, she is adopting a notion of fairness based "on what's

constitutionally required." (Attached as Exhibit 6, Gruber Dep. Tr. at 56:4–20.) With respect to constitutional standards, she also testifies as to the following:

> **Q:** Well, whether it was on its face or as applied, your conclusion was that DU's policy fell short of constitutional standards; isn't that right?
>
> **A:** Yes, I think it fails to give the kind of notice that's required under constitutional standards.

(*Id.* at 57:13–19.) It is well settled that "the federal Constitution does not establish the level of due process" that a private university, such as DU, has to give a student respondent in a disciplinary proceeding. *Bleiler v. Coll. Of Holy Cross*, No. 11-cv-11541, 2013 WL 4714340, at *4 (D. Mass. Aug. 26, 2013). Because Gruber does not have the requisite "knowledge, skill, experience, training, or education" to be an expert on conducting sexual-assault investigations on a college campus, her testimony and report must be precluded.

### B. Gruber's Opinions Are Improper and Insufficient and, thus, Should be Precluded.

#### 1. Gruber Cannot Testify About Legal Conclusions.

Setting aside Gruber's qualifications, her expert report is nothing more than a veiled attempt to instruct the jury on how to decide this case. The Tenth Circuit has held that expert testimony that "articulates the ultimate principles of law governing the deliberations of the jury" is inadmissible. *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc), *cert. denied* 488 U.S. 1008 (1989). Gruber opines that the Defendants failed to conduct an adequate, reliable, and impartial investigation into the alleged sexual-assault complaint against Plaintiff, which led to Plaintiff's alleged discriminatory expulsion—the outcome Plaintiff is ultimately asking the jury to find. For example, Gruber offers the following findings to support her conclusion that DU's investigation was defective and those defects contributed to the discriminatory outcome:

6

- "Despite the investigators' failure to distinguish between authentic and prompted testimony, the statements themselves evidence that the investigators were pushing witnesses to testify consistently with Complainant's initial statement." (Exhibit 1, Gruber Report at 7.)

- "The investigators stretch to resolve both these issues in Complainant's favor, but more importantly, they simply ignore the grave inconsistencies between her first and second statements, inconsistencies that bear directly on what happened in the period of time between waking up and having sex and whether it involved coercion." (*Id.* at 10.)

- "More importantly, the training [at DU] does not tell trainees to put aside preexisting notions like 'victims lie,' and look at the facts of each particular case. Rather, *it tells them what their preexisting beliefs should be*: One must assume that complainants rarely lie or exaggerate. Consequently, the University appears to deprioritize training in investigative technique, evidentiary rules, sexual assault law, and standards of proof, in favor of training designed to predispose investigators to find guilt." (*Id.* at 5.)

- "The [Investigation] Report is rife with methodological and analytical flaws, and it evidences a lack of basic understanding of sexual assault laws." (*Id.*)

- "Stereotypes also play a role. The investigators characterize Complainant's version, in which the man is the sexual aggressor, as more common-sensibly 'natural' than the Plaintiff's version, in which the woman is an eager and experienced party." (*Id.*)

- "I cannot say for sure whether such errors are due to mere malfeasance or to bias, but I suspect that some form of bias played a role." (*Id.* at 6.)[3]

- "They know that federal funding depends on being Title IX compliant which translates into 'zero tolerance' for sexual assault. This helps explain why all the lapses in investigative technique, problems with marshaling evidence, and flawed legal reasoning inured to the benefit of Complainant and detriment of Plaintiff." (*Id.* at 23.)

Gruber's deposition corroborates her report in that she is opining on legal conclusions.

---

[3] In addition to the sheer guesswork inherent in this opinion, Gruber "is unqualified to render an opinion regarding the thoroughness of or presence of bias in [the Title IX] investigation." *See Colgate Univ.*, 2017 WL 4990629, at *11.

7

> Q. But isn't it true that your opinion as an expert here is that given all of the flaws and deficiencies in the investigation that the conclusion that there was nonconsensual sex is flawed as well?
> A. Yes.
> (Exhibit 6, Gruber Dep. Tr. at 88:13–18.)
>
> Q. Right. And you are attempting to guide the jury as to the serious flaws in the process which led to an erroneous outcome; isn't that right?
> A. I am trying to point out the serious flaws in the process, correct.
> (*Id.* at 89:19–24.)
>
> Q. But you are saying that the deficiencies in the investigation were a result of certain stereotypical notions about gender; isn't that the – one of the cruxes of your report?
> A. Yes. One of the things I said is it seemed to me that some stereotypical notions about gender and sexuality were evidenced in the report.
> Q. And your conclusion is that those investigators actually did engage in that stereotyping of – of the – of the sexes?
> A. I do think there were portions of that where there was sex stereotyping.
> (*Id.* at 92:3–14.)
>
> Q. I understand that you could not – you cannot render an opinion with absolute certainty in this case; but isn't it your opinion as an expert that given the flaws that you pointed out in the process and given the sexual stereotyping that took place in the minds of the investigators, that **it is more likely than not that the outcome was tainted by a chauvinistic view of the sexes and sexual stereotyping?**
> A. More likely than not that the investigators, say, harbored views about men as sexual aggressors and women as sort of passive gatekeepers? That's kind of what they use in the social science literature. **Do I believe it's more likely than not that at least one of the investigators harbored those type of views? I do.**
> (*Id.* at 95:19–96:10 (emphasis added).)

All of these opinions are ultimate conclusions for the jury to make and, thus, Gruber's testimony should be precluded. *Colgate Univ.*, 2017 WL 4990629, at *10 ("the Court finds Gruber's conclusion improper because the question of whether there were defects in the proceedings against Plaintiff that impacted the outcomes of his hearings is . . . a legal conclusion.")

    **2. Gruber's Testimony will Not Help the Jury.**

Whether testimony is a proper subject for expert opinion is a question of common sense—i.e., whether an average juror is "qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702 advisory committee's note; see also *Water Pik, Inc. v. Med–Sys., Inc.*, 726 F.3d 1136, 1156 (10th Cir. 2013) (expert testimony not needed in trademark confusion case turning on the similarity or dissimilarity of two marks, because it was "a matter easily evaluated by laymen within the realm of their common knowledge and experience").

Throughout her report, and particularly in the section titled "Flawed and Disparate Credibility Determinations," Gruber steps into the jury box, and makes various credibility assessments. Gruber admitted to making assessments as to the credibility of evaluations made by the investigators. (Exhibit 6, Gruber Dep. Tr. at 25:6–9.[4]) She further admitted that credibility assessments are not only confined to what is on paper, but also based on nonverbal cues.

> Q. Right. And you're offering your opinion as to whether or not they did those credibility assessments in the right way or the wrong way, in the ideal way or the less-than-ideal way; isn't that right?
> A. I think that's fair.
> Q. Now, credibility assessments are – are not just confined to – to what's on paper; isn't that right? My question is: Nonverbal cues are very important in credibility assessments; wouldn't you agree?
> A. I would agree to that.
> Q. It's not just what somebody wrote, but also how that person said it, right?
> A. That could be an important factor in determining credibility if you do that well --

(*Id.* at 25:16-26:7.) Without the benefit of these non-verbal cues or any direct interactions with the witnesses, Gruber passes judgment on, and second-guesses, the correctness of the

---

[4] Q. Well, you've made assessments as to the credibility of evaluations made by the investigators in this case, right? A. Yes. (Exhibit 6, Gruber Dep. Tr. at 25:6–9.)

investigators' credibility assessments. Because credibility determinations plainly encroach upon the jury's role, Gruber's testimony must be precluded. "[E]xpert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact as required by Rule 702." *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999).

Further, Gruber's testimony will confuse, rather than help, the jury. For example, she criticizes DU's OEO Policy for not complying with the federal rules of criminal procedure (Exhibit 1, Gruber Report at 18–22), based on her mistaken belief that criminal procedures apply to a private university's student disciplinary process. *See e.g.*, *Questions and Answers on Title IX and Sexual Violence*, U.S. DEPT. OF EDUC. (Aug. 29, 2014) ("[A] Title IX investigation will never result in incarceration of an individual and, therefore, the same procedural protections and legal standards [from a criminal investigation] are not required.").[5] A jury listening to Gruber is required to assume that criminal procedures govern this case. Additionally, Gruber gratuitously offers her personal preference: "In my opinion, principles of basic fairness, legality, and impartiality dictate that such a process be far better than the one afforded to Plaintiff." (Exhibit 1, Gruber Report at 24.) The issue in this case is whether DU's OEO Policies and actions were discriminatory and whether DU followed those policies in the Title IX proceeding concerning Plaintiff, not whether another policy or process would have been more superior or preferable.

### 3. Gruber's Testimony Should be Excluded because it is Not Based on Reliable Data or Methodology.

---

[5] While the Department of Education has withdrawn this statement of policy, the fact that criminal standards are not used in a university's Title IX investigation still holds true. *See also*, *Colgate Univ.*, 2017 WL 4990629, at *11 ("[W]hat constitutes appropriate conduct can vary dramatically between criminal and Title IX investigation").

10

To be reliable, an expert's scientific testimony must be based on scientific knowledge, which "implies a grounding in the methods and procedures of science" based on actual knowledge, not "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Investors I*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593–94).

Here, Gruber's opinion is unreliable because it is not anchored on any standards, regulations, or other objective evidence related to university investigations of sexual assaults. Gruber's testimony is based on her own subjective belief and unsupported, conclusory speculation. For example, Gruber opines as to the following:

- "But the training used by the University **appears to be** more biasing than de-biasing. It is unlikely that self-selecting Title IX investigators, in contrast to jurors off the street, harbor negative stereotypes such as 'all rape complainants lie.'" (Exhibit 1, Gruber Report at 5 (emphasis added).)

- "[T]he University **appears to** deprioritize training in investigative technique, evidentiary rules, sexual assault law, and standards of proof, in favor of training designed to predispose investigators to find guilt." (*Id.* (emphasis added).)

- "Other courses offered or endorsed by the University and attended by various OEO staffers **appear to be** about predisposing staff to a particular set of views on sexual assault and the inherent credibility of complainants and respondents." (*Id.* (emphasis added).)

- "I **cannot say for sure** whether such errors are due to mere malfeasance or to bias, but **I suspect** that some form of bias played a role." (*Id.* at 6 (emphasis added).)

Gruber does not cite to any methods or procedures that have been tested or peer reviewed to support these statements. *See Bazile v. City of New York*, 215 F. Supp. 2d 354, 365 (S.D.N.Y.

2002) (holding that expert was unqualified because, even though expert had "experience . . . in supervision of law enforcement personnel, he [had] none in conducting internal disciplinary investigations").

### C. Hanna Stotland's Opinions Should be Precluded.

Stotland's expert opinion concerns Plaintiff's intention to enter law school, his future professional prospects, and his behavior and mental processes. Plaintiff's intention to enter law school and his future professional prospects are purely speculative and, thus, her opinions should be precluded. Further, Stotland is not qualified to opine on Plaintiff's behavior or mental processes and, thus, her opinions concerning Plaintiff struggling socially, feeling disconnected, and suffering from a loss of confidence should also be precluded. Lastly, any testimony concerning Stotland's version of "relevant facts" should be precluded because the determination of relevant facts are within the province of the jury.

Stotland's expert opinion—the impact of John Doe's expulsion from DU on his future educational and employment prospects—is drawn from her having "worked with more than a dozen students accused of sexual misconduct under Title IX at U.S. educational institutions."[6] Exhibit 2, Stotland Report at 1. Stotland professes to be "the only educational consultant in the United States who has built a specialty assisting students who have been accused or disciplined under Title IX." *Id.* She opines that John Doe's expulsion "is and may continue to be a serious harm to his academic and professional future." *Id.* at 6. Plaintiff's intention to enter law school

---

[6] Working with a dozen students "by crafting an optimal, honest set of essays" for college admission (Exhibit 2, Stotland Report at 5) hardly meets the requisite "knowledge, skill, experience, training or education" to qualify as an expert in "forecasting" a student's education and employment prospects.

and his future professional prospects are purely speculative and, thus, Stotland's opinions should be precluded.

To begin with, Stotland's entire report is premised on her assumption that John Doe plans to attend law school in the future. (*Id.* at 4 ("John Doe currently expresses an interest in attending law school.").) Whether John Doe, a sophomore at DePaul University at the time of Stotland's report, attends law school is entirely conjectural. In her deposition, Stotland admitted that she never spoke to Doe concerning his "interest" in law school. (Exhibit 7, Stotland Dep. Tr. at 33:9–15.) Stotland further recognized that it is not unusual for sophomores in college to change their minds about graduate school:

> Q. And by that same token, it is not very common for a sophomore to be that resolute in his intention to go to law school; isn't that right?
> A. I don't know that I agree that it's unusual for sophomores to have resolute plans about graduate school. I would say that they – or it's not unusual for them to change their minds.
> Q. And you know, from reading the record, that [Doe] went to DU as an engineering student. We talked about that, right?
> A. Yes.
> Q. And you also know, I take it, that he had a stint in acting school; is that right?
> A. Well, he described, in his deposition, that he was taking courses at a for-profit school in Los Angeles, I believe.
> A. Pursuing acting, right?
> A. Yes.
> Q. So, essentially, your report presupposes or assumes that this proposition is true; i.e., [Doe] intends to go to law school? Isn't that right?
> A. Well, if [Doe] does not intend to go to law school, then the portion of his report concerning his law school prospects is less relevant. . . .

(*Id.* at 40:4–41:7.) In a clear acknowledgment of the speculative nature of her opinion, Stotland specifically testified that her report attempts to "forecast" Doe's educational and employment prospects:

13

> Q. Okay. Let me help you out here. Your task seems to be to try to forecast [Doe's] educational prospect and employment prospects in light of his Title IX violation record; isn't that right?
> A. Yes. Forecast is a good word to use.

(*Id.* at 35:24–36:4.) Stotland simply hypothesizes that, with a Title IX record, John Doe is less likely to be accepted into a top-tier law school, which, in her opinion, "offer[s] more and better opportunities to their graduates." (Exhibit 2, Stotland Report at 5.) Recognizing that "outstanding and successful lawyers may be found among the alumni of every accredited law school," Stotland nonetheless opines that John Doe's "chances" of finding employment and "earn[ing] more" may be limited by his possible acceptance into a lower-ranked law school. (*Id.*) Stotland further opines: "Absent his expulsion, I would have no equivalent concerns about his prospects; the university discipline record is the direct cause of my opinion." (*Id.*) However, during her deposition, Stotland admitted that Doe's GPA performance, LSAT score, and career choices would affect his job prospects in the future. (Exhibit 7, Stotland Dep. Tr. at 36:12–37:21.) Accordingly, Stotland's opinion regarding Plaintiff's intention to go to law school and his future academic and professional prospects are entirely speculative and should be precluded. *Daubert*, 509 U.S. at 590 (finding, to be reliable, an expert's testimony cannot be based on "subjective belief or unsupported speculation").

Further, Stotland should be precluded from opining that Plaintiff has experienced "social struggle, sense of disconnection and loss of confidence." (Exhibit 2, Stotland Report at 4.) Stotland is not a psychologist, social worker, or any other type of medical professional (attached as Exhibit 8, see generally Stotland CV) and, thus, she is not qualified to opine on Plaintiff's alleged behavioral or mental challenges. *Nacchio*, 555 F.3d at 1241 (In determining whether

14

expert testimony is admissible, the Court must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion.).

Stotland's expert report also includes a section titled "Summary of relevant facts" where she describes the sexual encounter of John and Jane Doe on October 8, 2014. The "Summary of relevant facts" section is not relevant to Stotland's conclusion that "John Doe's expulsion from the University of Denver for sexual assault is and may continue to be a serious harm to his academic and professional future." *See* F.R.E. 401. The only facts that are relevant to Stotland's expert report are that DU found John Doe responsible for non-consensual sexual contact and expelled him from the University.[7]

The Court should exclude any testimony concerning Stotland's summarization of the "facts" because credibility determinations and the determination of "relevant facts" are within the province of the jury. *Bledsoe v. Bruce*, 569 F.3d 1223, 1237 (10th Cir. 2009) ("Credibility determinations are within the province of the jury."); *United States v. Toledo*, 985 F.2d 1462, 1470 (10th Cir. 1993) ("The credibility of witnesses is generally not an appropriate subject for expert testimony.").

## IV.    CONCLUSION

WHEREFORE, Defendants respectfully request that the Court exclude the expert testimony of Aya Gruber and Hanna Stotland in its entirety.

---

[7] Further, in this same section, Stotland makes credibility determinations as to Jane Doe and Resident Director Mariano, which is improper. For example, Stotland states:
> The documents I reviewed contained no coherent explanation for the evolution of Jane's recollection, or why the earliest reported recollection should not be viewed as the most reliable – or, in the alternative, why Resident Director Mariano would have lied or erred as to the central claim in his brief report.

(Exhibit 2, Stotland Report at 3.)

15

Respectfully submitted this 29th of January, 2018.

**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**

s/ LaLonnie Gray
*Jim Goh*
*LaLonnie Gray*
600 17th Street, Suite 2700S
Denver, CO  80202
Telephone:  720-343-7570
Facsimile:   720-343-7571
jgoh@constangy.com
lgray@constangy.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th of January, I electronically filed the foregoing **DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Michael J. Mirabella, Esq.
mmirabella@mbellalaw.com

Andrew T. Miltenberg, Esq.
amiltenberg@nmllplaw.com

Tara J. Davis
tdavis@nmllplaw.com

s/ LaLonnie Gray
*LaLonnie Gray*