## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-00152-PAB-STV

JOHN DOE,

      Plaintiff,

v.

UNIVERSITY OF DENVER, et al.

      Defendants.

## DECLARATION OF MARISA AYA GRUBER

      MARISA AYA GRUBER hereby declares, subject to the penalties of perjury pursuant to 28 U.S.C. § 1746:

      1.    I submit this declaration as an expert for Plaintiff John Doe ("John Doe" or "Plaintiff"). It is my understanding that Defendants recently made a motion to exclude portions of my expert report and preclude me from testifying in this action. I submit this declaration in support of Plaintiff's response to that motion.

      2.    I have attached a true and correct copy of the most recent version of my Curriculum Vitae as Exhibit 1.

      3.    I have attached a true and correct copy of the expert report that I prepared for this case as Exhibit 2.

## I.    Background: The Impact of Feminist Legal Theory and Feminist Reforms on Procedures in Sexual Assault Cases

      4.    For over twenty years, I have researched and written about the tension between the process rights of those accused of rape and the need to address the problem of rape, within an ostensibly rape-permissive society. More specifically, I have engaged in research and writing about reforms that expand substantive definitions of rape and sexual assault and reduce procedural protections for accuseds in an effort to reduce violence against women, change cultural and social norms regarding sexual behavior, counter "rape myths," and encourage women to report sexual assault.

5.      My articles that discuss the influence of feminist ideas and proposals on sexual assault law and policy include: (i) *Pink Elephants in the Rape Trial*: *The Problem of Tort-Type Defenses in the Criminal Law of Rape*, 4 WM. & MARY J. WOMEN & L. 203 (1998) (hereinafter "*Pink Elephants*"); (ii) *Rape, Feminism, and the War on Crime*, 84 WASH. L. REV. 581 (2009); (iii) *Neofeminism*, 50 HOUSTON L. REV. 1325 (2013); (iv) *Anti-Rape Culture*, 64 U. KANSAS L. REV. 1027 (2016); (v) *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. 279 (2016); (vi) *Not Affirmative Consent*, 47 MCGEORGE L. REV. 683 (2016); and (vii) *Consent Confusion*, 38 CARDOZO L. REV. 415 (2016).  I have attached true and correct copies of these articles to this declaration as Exhibits 3-9. *Pink Elephants*, published in 1998, for example, discusses extensively the "tension between feminism and fair trial" in the context of rape shield reforms. Ex. 3, *Pink Elephants*, 4 WM. & MARY J. WOMEN & L. at 210.

6.      More specifically, my scholarship discusses the history and prevalence of the sexist belief that women who claim to have been raped are particularly untrustworthy as compared to other classes of victims/witnesses.   In response, feminist writers publicized the famous "2%" statistic, which has been hotly contested, to publicize the notion that rape complainants are *more* credible than other types of complainants.  *See* Ex. 4, *Rape Feminism and the War on Crime*, 84 WASH. L. REV. at 590-602 (discussing how pre-reform doctrine perpetuated the image of the lying vindictive shrew, how this image continued to be salient in modern times, and how feminism sought to counter those beliefs through publicizing low false-report statistics and transforming trial processes).  Reformers also argued that rape complainants have superior credibility because the stigma attached to reporting rape naturally filtered out those who might fabricate.  *See* Ex. 7, *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. at 287. This "believe the victim" mantra was developed to encourage sexist police and prosecutors to credit victims and pursue cases, unless and until they discovered compelling evidence of untruthfulness.  It was also meant to counteract fact-finders' sexist presumptions that rape complainants are particularly prone to fabrication.  *See* sources cited *supra* and footnotes cited therein.

7.      In the post-Dear Colleague Letter era, the "believe the victim" mantra has become decontextualized from its historical purposes.  It no longer simply exhorts police not to arbitrarily drop cases or sexist factfinders to consider rape complainants like all other complainants, but sets up a *sui generis* presumption that a given rape victim is truthful and accurate, which can only be rebutted through the clearest proof of fabrication.  In today's feminist culture, keeping an open

mind about a rape allegation that is denied by the accused, is simply taboo.  *See* Ex. 7, *Rape Law Revisited*, 13 Ohio St. J. Crim. L. at 285-89 and sources cited (discussing the history of reforms to counter rape myths in criminal law, such as rape shield laws and affirmative consent, which have been incorporated into many campus procedures, and concluding that "the justification of feminist rape reforms as necessary to counter the anti-rape-victim bent of criminal law actors in the 1980s and 1990s does not easily translate to the Title IX reform context, where fact-finders are more likely to lean the opposite direction.")

8.     Many of my articles examine the feminist argument, which has gained enormous traction in United States legal discourse and reform over the past decade, that adjudicative processes should be constructed to encourage women to report rape and sexual assault, under the theory that rape, especially campus rape, is a widespread "epidemic" that is widely underreported. *See, e.g.*, Ex. 6, *Anti-Rape Culture* 64 U. Kansas L. Rev. at 1028-39.  Advancing this argument, feminists successfully pursued reforms, such as rape shield laws and affirmative consent standards that lessen the "ordeal" of the sexual assault fact-finding process and make convictions more easily obtainable, in turn encouraging reporting.  These reforms drew strong criticisms from defense attorneys and civil libertarians who argued that they encroached on the accuseds' ability to adequately defend against charges. *See* Ex. 4, *Rape Feminism and the War on Crime*, 84 Wash. L. Rev. at 613-14; Ex. 7, *Rape Law Revisited,* 13 Ohio St. J. Crim. L. at 285; Ex. 9, *Consent Confusion*, 38 Cardozo L. Rev. at 445-52.

9.     Relatedly, my work explores the popular feminist notion of the need to presume that complainants suffer from trauma that can be re-triggered and how that notion affects law and policy.  There are two consequences of this ideology to procedural fairness.  First, feminists, antirape activists, prosecutors, and complainants' advocates invoke the trauma frame to explain away complainants' credibility issues, for example, significant delays in reporting, inconsistent statements, fragmented memory, illogical stories, and time frame problems, and even to *prove* rape occurred (through the assertion that trauma-consistent behavior is itself proof of rape).  In the criminal context, evidence of the complainants' trauma comes by way of expert testimony, subject to admissibility rules and adversarial testing.  However, in public discourse and Title IX training, complainant trauma is simply presumed. Second, the ideology entails "trauma-informed" processes that seek to render the process more comfortable for presumptively fragile complainants, including validating complainants' claims and feelings of victimhood, refraining from exacting

3

questioning and cross-examination, declaring certain lines of inquiry off limits, prohibiting direct interaction with accuseds, and providing emotional closure through findings of guilt. *See* Ex. 7, *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. at 282-87; Ex. 6, *Antirape Culture*, 64 U. KANSAS L. REV. at 1039-49; Ex. 4, *Rape Feminism and the War on Crime*, 84 WASH. L. REV. at 600-01.

      10.    As part of my work, I have also analyzed how substantive criminal law definitions, including force, consent, and affirmative consent standards, evolved in tandem with, and in response to, feminist efforts to expand the criminalization of a range of harmful sexual behaviors. *See generally* Ex. 3, *Pink Elephants*, 4 WM. & MARY J. WOMEN & L. 203 (1998)*;* Ex. 4, *Rape Feminism and the War on Crime*, 84 WASH. L. REV. 581 (2009)*;* Ex. 7, *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. 279 (2016)*;* Ex. 8, *Not Affirmative Consent*, 47 MCGEORGE L. REV. 683 (2016)*.* In doing so, I examined the move to expand notions of force to include more subtle forms of coercion, including emotional and moral coercion. *See* Ex. 9, *Consent Confusion*, 38 CARDOZO L. REV. at 421-23; Ex. 3, *Pink Elephants,* 4 WM. & MARY J. WOMEN & L. at 207-09; and Ex. 4, *Rape Feminism, and the War on Crime*, 84 WASH. L. REV. at 601-02. In my capacity as an advisor to the Model Penal Code sexual assault project, I have extensively researched and discussed where to draw the line between persuasion and coercion, between lawful pressure and prohibitable force. Moreover, *Consent Confusion* examines in detail the substantive definitions of sexual assault in campus codes and how they are and should be interpreted. Ex. 9, 38 CARDOZO L. REV. at 430-39.

      11.    My work also extensively discusses intent standards for sexual assault liability, including that affirmative consent standards make accuseds strictly liable for sex in the absence of a yes or its functional equivalent, the difference between knowledge and negligence standards for coerced or unconsensual sex; and how principles of legality require that accuseds be *culpable*, in that they knew or had reason to know the internal state of mind of the complainant. *See generally* Ex. 9, *Consent Confusion*, 38 CARDOZO L. REV. 415 (2016); Ex. 7, *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. 279 (2016). Feminist arguments about rape underreporting and underenforcement, as well as the need to tailor the trial to secure guilt and encourage reporting, has informed college and university disciplinary processes. The United States Department of Education, Office for Civil Rights, April 4, 2011 Dear Colleague Letter (the "Dear Colleague Letter") concretizes many of those feminist principles, including deprioritizing due process protections for accused individuals, by inter alia eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute

resolution. Ex. 10, Dear Colleague Letter, at pp. 8, 10-12; *see also* Ex. 11, DOE 2014 Questions and Answers on Title IX and Sexual Violence ("2014 Q & A"), at p. 31 (adopting rape shield principles and advising schools that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant").

12.  My work further discusses how feminist reformist sentiments informed the Dear Colleague Letter, Title IX cases, and discourse on campus sexual assault.  *See generally* Ex. 7, *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. at 285.  The Dear Colleague Letter responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the Office for Civil Rights for its lax response to what the report characterized as a social problem of critical importance. *See* ht tp://www.npr.org/templates/story/story.php?storyId=124001493.  The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (*e.g.* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

13.  In response, Russlyn Ali, who was then the Assistant Secretary for Civil Rights, issued the Dear Colleague Letter, which sounded a "call to action for the nation" to address sexual assault, adopted the feminist program of reducing obstacles to finding guilt, including requiring colleges and universities to use the lowest civil standard of proof and eschewing a presumption of innocence for accuseds.  Ex. 10, Dear Colleague Letter, at pp. 2, 10-11; *see also* Ex. 11, 2014 Q & A, at pp. 27, 31. My scholarship discusses the dangerous interplay of this low, and easily misapplied, standard of proof and feminist pro-victim presumptions.  *See* Ex. 7, *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. 287-89.  Moreover, the Dear Colleague Letter, adhering to the feminist idea of retriggered trauma and gendered power imbalance, forbids alternative dispute resolution, specifically voluntary mediation. Ex. 10, at p. 8. The Letter moreover "strongly discourages" schools from permitting respondents to question victims, under the presumption that "[a]llowing an alleged perpetrator to question an alleged victim may be traumatic or intimidating." *Id.* at p. 12.

14.    In the post Dear Colleague Letter era, feminist activists have renewed concerns over a "rape culture," which involves disbelieving complainants, victim blaming, overprotecting accused men, encouraging masculinist sexual aggression, and widespread underreporting and underenforcement. *See* Ex. 6, *Anti-Rape Culture*, 64 U. KANSAS L. REV. at 1028-39; Ex. 7, *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. at 280-87. Influenced by this narrative, universities prioritize tough enforcement and pro-complainant policies that presumably encourage reporting and maintain a better balance between accusation-to-guilt ratio over administrable sexual assault standards, fair evidentiary rules and presumptions, and ultimately accuracy. *See* Ex.7, *Rape Law Revisited*, 13 OHIO ST. J. CRIM. L.at 286-89; Ex. 9, *Consent Confusion*, 38 CARDOZO L. REV. 443-47.

15.    The claims I make in the above cited articles are supported by a total of 1682 footnotes comprised of hundreds of sources, including cases, statutes, books, law review articles, sociological studies, and popular media sources.  The cases, statutes, law review articles, and books on feminism, rape law, rape reform, and campus sexual assault that cited in my articles are simply too numerous to list.  The following is a sample of other types of sources (news articles, empirical studies, and university policies and documents) from just two of my recent articles (*AntiRape Culture* and *Consent Confusion*):

a.  The news articles cited in *Antirape Culture*, (Ex. 6), alone, include:

Claire Gordon, *When America Started Caring About Rape*, AL JAZEERA AM. (Mar. 20, 2015); Lauren Kelley, *America Has a Rape Problem—and Kate Harding Wants to Fix It*, ROLLING STONE (Aug. 24, 2015); Ryan Broderick et al., *What Is Rape Culture?*, BUZZFEED NEWS (Feb. 5, 2014); Alana Prochuk, *Rape Culture Is Real—And Yes, We've Had Enough*, WOMEN AGAINST VIOLENCE AGAINST WOMEN (Apr. 18, 2013); Melissa McEwan, *Rape Culture 101*, SHAKESVILLE (Oct. 9, 2009): Julia Kacmarek & Elizabeth Geffre, *Rape Culture Is: Know It When You See It*, HUFFPOST C. (June 1, 2013); Joseph Shapiro, *Campus Rape Reports Are Up, and Assaults Aren't the Only Reason*, NPR NEWS (Apr. 30, 2014); Tyler Kingkade, *College Sexual Assault Survivors Form Underground Network to Reform Campus Policies*, HUFFINGTON POST (Mar. 21, 2013); Vanessa Grigoriadis, *Campus Rape, Still a Nightmare*, N.Y. MAG. (Dec. 22, 2014); Sally Williams, *Campus Nightmare: Female Students on the Rise of Sexual Harassment*, GUARDIAN (Oct. 11, 2014); Tara Culp-Ressler, *New Study Finds 'Epidemic Level' of Rape on College Campus*, THINKPROGRESS (May 20, 2015); Alex Morris, *'The Hunting Ground': Inside a Crucial Look at the Campus-Rape Crisis*, ROLLING STONE (Mar. 3, 2015); Anya Jaremko-Greenwold, *Kirby Dick and Amy Ziering on Exposing the Horrifying Campus Rape Epidemic in 'The Hunting Ground'*, INDIEWIRE (Feb. 26, 2015); Emily Yoffe, *The College Rape Overcorrection*, SLATE (Dec. 7, 2014); Morgan Baskin, *Controversial 1-in-5 Sexual Assault Statistic Validated in New National Survey*, USA TODAY (Sept. 21, 2015); Theodore R. Del-Wiche & Mariel A. Klein, *Survey Reveals 'Troubling' Sexual Assault Climate at Harvard, Faust Says*, HARV. CRIMSON (Sept. 21, 2015); Lizzie Crocker, *Why*

*the New 'One in Four' Campus Rape Statistic Is Misleading*, DAILY BEAST (Sept. 21, 2015); Jennifer Baker, *Campus Rape Skepticism: How Not to 'Debunk' Research*, PSYCHOL. TODAY (Mar. 6, 2015); Drew Faust, *Statement on the Results of the Sexual Conduct Survey*, HARV. U. (Sept. 21, 2015); Ezra Klein, *"Yes Means Yes" Is a Terrible Law, and I Completely Support It*, VOX (Oct. 13, 2014); Callie Beusman, *'Yes Means Yes' Laws Will Not Ruin Sex Forever, Despite Idiotic Fears*, JEZEBEL.COM (Sept. 8, 2014); Jessica Roy, *The Celebrity Nude Photo Leak Is Just Another Form of Online Harassment of Women*, N.Y. MAG. (Sept. 1, 2014); Kirsten Gillibrand, *Kirsten Gillibrand: 'We Will Not Allow These Crimes to Be Swept Under the Rug Any Longer'*, TIME (May 15, 2014); Amanda Marcotte, *Rape Victims Are Common. Rapists Are Not.*, SLATE (May 1, 2014); Dave Gustafson, *Serial Rapists Commit 9 of 10 Campus Sexual Assaults, Research Finds*, AL JAZEERA AM. (Oct. 28, 2013); Jennifer Peebles & Kristen Lombardi, *'Undetected Rapists' on Campus: A Troubling Plague of Repeat Offenders*, CTR. PUB. INTEGRITY (Feb. 26, 2010 ); Lizzie Crocker, *Is Sex Assault Coverage Really Sexist?*, DAILY BEAST (Dec. 18, 2015); Associated Press, *As Freshmen Enter 'Red Zone,' Colleges Re-Think Sexual Assault Policies*, USA TODAY (Sept. 7, 2014 ); Andrea Pino, *The Second Rape: Battling PTSD and Betrayal*, HUFFINGTON POST (Sept. 9, 2013); Eliza Gray, *Why Victims of Rape in College Don't Report to the Police*, TIME (June 23, 2014); Jessica Bennett, *Campus Sex . . . With a Syllabus*, N.Y. TIMES (Jan. 9, 2016); Katie J.M. Baker, *Rape Victims Don't Trust the Fixers Colleges Hire To Help Them*, BUZZFEED NEWS (Apr. 25, 2014); Nick Anderson, *New Safety Rules Announced for University of Virginia Fraternity Parties*, WASH. POST (Jan. 6, 2015); Tanya Somanader, *President Obama Launches the "It's On Us" Campaign to End Sexual Assault on Campus*, WHITE HOUSE (Sept. 19, 2014); Jenna Johnson, *Schools Try New Strategies to Battle College Drinking*, WASH. POST MAG. (Aug. 30, 2013); Akane Otani, *Banning Drinking Won't Stop Campus Rape*, BLOOMBERG (Dec. 4, 2014); Donald Eastman, *"An Open Letter to Students": President Eastman Emails Eckerd Community About Sexual Assault and Harassment on Campus*, CURRENT (Nov. 23, 2014); Cathy Young, *A Real Dialogue for a Change: Which May Be a First on the Issue of Campus Rape Hysteria*, WKLY. STANDARD (Jan. 25, 2016); Raina Lipsitz, *Society Has an Ethical Obligation to Report Rape*, AL JAZEERA AM. (Nov. 22, 2014); Jeannie Suk, *The Trouble with Teaching Rape Law*, NEW YORKER (Dec. 15, 2014); Jenny Jarvie, *Trigger Happy*, NEW REPUBLIC (Mar. 3, 2014); Katie J.M. Baker, *Teaching Rape Law in the Age of the Trigger Warning*, BUZZFEED NEWS (Apr. 3, 2015); Tyler Kingkade, *Despite Fears About Trigger Warnings, Survey Suggests Few Faculty Are Forced to Use Them*, HUFFINGTON POST (June 23, 2015).

   b.  The empirical studies cited in *Anti-Rape Culture*, (Ex. 6), alone include:

Douglas W. Pryor & Marion R. Hughes, *Fear of Rape Among College Women: A Social Psychological Analysis*, 28 VIOLENCE & VICTIMS 443, 444 (2013); Jodi Lane et al., *Fear of Violent Crime Among Men and Women on Campus: The Impact of Perceived Risk and Fear of Sexual Assault*, 24 VIOLENCE & VICTIMS 172 (2009); Sofi Sinozich & Lynn Langton, *Rape and Sexual Assault Victimization Among College-Age Females, 1995–2013*, U.S. DEP'T JUST. BUREAU JUST. STAT. 3 (Dec. 2014); Michael Planty et al., *Female Victims of Sexual Violence, 1994–2010*, U.S. DEP'T JUST. BUREAU JUST. STAT. 1 (Mar. 2013); Susan Sprecher et al., *Token Resistance to Sexual Intercourse and Consent to Unwanted Sexual Intercourse: College Students' Dating Experiences in Three Countries*, 31 J. SEX RES. 125, 130 (1994); DAVID CANTOR ET AL., REPORT ON THE AAU CAMPUS CLIMATE SURVEY ON SEXUAL ASSAULT AND SEXUAL MISCONDUCT (Sept. 21, 2015); CHRISTOPHER KREBS ET AL., THE CAMPUS SEXUAL ASSAULT (CSA) STUDY (Dec. 2007);

*Washington Post-Kaiser Family Foundation Survey of College Students on Sexual Assault*, WASH. POST; Terry P. Humphreys & Mélanie M. Brousseau, *The Sexual Consent Scale—Revised: Development, Reliability, and Preliminary Validity*, 47 J. SEX RES. 420, 421 (2010); Terry P. Humphreys, *Understanding Sexual Consent: An Empirical Investigation of the Normative Script for Young Heterosexual Adults* in MAKING SENSE OF SEXUAL CONSENT 209 (Mark Cowling & Paul Reynolds eds., 2004); David S. Hall, *Consent for Sexual Behavior in a College Student Population*, ELECTRONIC J. HUM. SEXUALITY (Aug. 10, 1998); Lucia F. O'Sullivan & E. Sandra Byers, *College Students' Incorporation of Initiator and Restrictor Roles in Sexual Dating Interactions*, 29 J. SEX RES. 435 (1992); Annika M. Johnson & Stephanie M. Hoover, *The Potential of Sexual Consent Interventions on College Campuses: A Literature Review on the Barriers to Establishing Affirmative Sexual Consent*, 4 PURE INSIGHTS (2015); Susan E. Hickman & Charlene L. Muehlenhard, *"By the Semi-Mystical Appearance of a Condom": How Young Women and Men Communicate Sexual Consent in Heterosexual Situations*, 36 J. SEX RES. 258 (1999); Charlene L. Muehlenhard & Lisa C. Hollabaugh, *Do Women Sometimes Say No When They Mean Yes? The Prevalence and Correlates of Women's Token Resistance to Sex*, 54 J. PERSONALITY & SOC. PSYCHOL. 872 (1988); Michael W. Weiderman, *The Gendered Nature of Sexual Scripts*, 13 FAM. J.: COUNSELING & THERAPY FOR COUPLES & FAMS. 496, 498–500 (2005); O'Sullivan & Byers, *supra* note 62, at 435–36, 444–45; *generally* David Lisak & Paul M. Miller, *Repeat Rape and Multiple Offending Among Undetected Rapists*, 17 VIOLENCE & VICTIMS 73 (2002); Kevin M. Swartout et al., *Trajectory Analysis of the Campus Serial Rapist Assumption*, 169 JAMA PEDIATRICS 1148, 1149 (2015),; Katrina A. Vickerman & Gayla Margolin, *Rape Treatment Outcome Research: Empirical Findings and State of the Literature*, 29 CLINICAL PSYCHOL. REV. 431, 431 (2009); Ron Acierno et al., *Risk Factors for Rape, Physical Assault, and Posttraumatic Stress Disorder in Women: Examination of Differential Multivariate Relationships*, 13 J. ANXIETY DISORDERS 541, 543 (1999); Barbara Olasov Rothbaum et al., *A Prospective Examination of Post-Traumatic Stress Disorder in Rape Victims*, 5 J. TRAUMATIC STRESS 455 (1992); NAT'L VICTIM CTR. & CRIME VICTIMS RES. & TREATMENT CTR., RAPE IN AMERICA: A REPORT TO THE NATION 7 (Apr. 23, 1992); Patricia A. Resick, *The Psychological Impact of Rape*, 8 J. INTERPERSONAL VIOLENCE 223, 225 (1993); Sarah E. Ullman et al., *Psychosocial Correlates of PTSD Symptom Severity in Sexual Assault Survivors*, 20 J. TRAUMATIC STRESS 821, 822 (2007); Dean G. Kilpatrick et al., *Victim and Crime Factors Associated with the Development of Crime-Related Post-Traumatic Stress Disorder*, 20 BEHAVIORAL THERAPY 199 (1989); Ullman et al., *supra* note 80, at 822 (citing Patricia A. Frazier et al., *Perceived Control and Distress Following Sexual Assault: A Longitudinal Test of a New Model*, 84 J. PERSONALITY & SOC. PSYCHOL. 1257 (2003); Mary P. Koss et al., *Cognitive Mediation of Rape's Mental, Physical, and Social Health Impact: Tests of Four Models in Cross-Sectional Data*, 70 J. CONSULTING & CLINICAL PSYCHOL. 926 (2002); Sarah E. Ullman & Henrietta H. Filipas, *Predictors of PTSD Symptom Severity and Social Reactions in Sexual Assault Victims*, 14 J. TRAUMATIC STRESS 369 (2001); Christine A. Gidycz & Mary P. Koss, *Predictors of Long-Term Sexual Assault Trauma Among a National Sample of Victimized College Women*, 6 VIOLENCE & VICTIMS 175 (1991); Elizabeth A. Armstrong et al., *"Good Girls": Gender, Social Class, and Slut Discourse on Campus*, 77 SOC. PSYCHOL. Q. 100 (2014); Anke Ehlers et al., *Intrusive Re-Experiencing in Post-Traumatic Stress Disorder: Phenomenology, Theory, and Therapy*, 12 MEMORY 403, 404 (2004); Ann Hackmann et al., *Characteristics and Content of Intrusive Memories in PTSD and Their Changes with Treatment*, 17 J. TRAUMATIC STRESS 231, 231 (2004); Alishia D. Williams & Michelle L. Moulds, *An Investigation of the Cognitive and Experiential Features of Intrusive Memories in Depression*, 15 MEMORY 912, 913 (2007); Lorna

Veraldi & Donna M. Veraldi, *Is There a Research Basis for Requiring Trigger Warnings?*, FORENSIC PSYCHOL. 1, 5–7 (Mar. 26, 2015).

    c.  The university codes, policy documents, and training materials cited in *Anti-Rape Culture*, (Ex. 6), and *Consent Confusion*, (Ex. 9), include:

*Stalking and Relationship Violence*, U. MINN. (Aug. 2015), https://policy.umn.edu/operations/ sexualassault; *Sexual Misconduct*, EMORY U. (Sept. 26, 2016), https://policies.emory.edu/8.2; *Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy*, BROWN U. 7 (Sept. 2, 2016), https://www.brown.edu/about/administration/ title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/policy-final-sept-16.pdf; *Prohibited Student Conduct: Sexual Assault*, CORNELL U., http://titleix.cornell.edu/prohibited-conduct/sexual-assault (last visited Oct. 31, 2016); *Sexual Misconduct*, U. COLO. (July 1, 2015), http://www.cu.edu/sites/default/files/5014.pdf; *Sexual Respect: Definitions*, DARTMOUTH C., http://www.dartmouth.edu/sexualrespect/definitions.html#consent (last updated Feb. 3, 2015); *Yale Sexual Misconduct Policies and Related Definitions*, YALE U., http://smr.yale.edu/sexual-mis conduct-policies-and-definitions; *Policy on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence*, U. VA. 13 (July 1, 2015), https://vpsa.virginia.edu/ sites/vpsa.virginia.edu/files/Title%20IX%20VAWA%20Umbrella%20Policy.pdf; *Prohibited Sexual Conduct: Sexual Misconduct, Sexual Assault, Stalking, Relationship Violence, Violation of University or Court Directives, Student-on-Student Sexual Harassment and Retaliation*, STAN. U. (Mar. 11, 2016), https://adminguide.stanford.edu/printpdf/chapter-1/subchapter-7/policy-1-7-3 [hereinafter *Stanford Policy*] ("It is the responsibility of person(s) involved in sexual activity to ensure that he/she/they have the affirmative consent of the other . . . ."); *Student Sexual Misconduct Policy and Procedures: Duke's Commitment to Title IX*, DUKE U., https:// studentaffairs.duke.edu/conduct/z-policies/student-sexual-misconduct-policy-dukes-commitment-title-ix#consent (last visited Oct. 24, 2016); *Wesleyan University 2016–2017 University Standards and Regulations*, WESLEYAN U. 23, http://www.wesleyan.edu/studentaffairs/ studenthandbook/StudentHandbook.pdf; *Amherst College Sexual Misconduct and Harassment Policy*, AMHERST C., https://www.amherst.edu/campuslife/health-safety-wellness/sexual-respect/ sexual-misconduct-and-harassment-policy/node/497976; *The Johns Hopkins University Sexual Misconduct Policy and Procedures*, JOHNS HOPKINS U., http://sexualassault.jhu.edu/policies-laws/ #Section%20III%20-%20Definitions; *Gender-Based Misconduct Policy for Students*, COLUM. U. 7 (Sept. 19, 2016), http://www.columbia.edu/cu/studentconduct/documents/GBMPolicyand ProceduresforStudents.pdf; *Policy on Harassment, Discrimination, and Sexual Misconduct*, U. CHI., https://studentmanual.uchicago.edu/page/policy-harassment-discrimination-and-sexual-misconduct#Consent YALE UNIV., 2013 ANNUAL SECURITY REPORT 21 (2014), http:// your.yale.edu/sites/default/files/files/Yale%20Clery%20Report%202013.pdf; *Rape Culture*, MARSHALL U. WOMEN'S CTR., http://www.marshall.edu/wcenter/sexual-assault/rape-culture/; *Sexual Assault: Myths and Facts*, ROGER WILLIAMS U. COUNSELING CTR., http://www.rwu.edu/campus-life/health-counseling/counseling-center/sexual-assault/rape-myths-and-fac; *What the "System" Will Do For You If You Are a Victim*, UAB POLICE, https://uab.edu/police/programs-and-services/victim-awareness-assistance-program/what-the-qsystemq-will-do-for-you; *Frequently Asked Questions About Sex Discrimination, Sexual Misconduct, Sexual Harassment, and Sexual Violence*, FLA. ST. U., https://smr.fsu.edu/documents/Sexual-Harassment-FAQ.pdf; *Title IX Coordinators Team for*

*Sexual Harassment Education*, U. COLO. (Jan. 30, 2015), https://connections.cu.edu/stories/title-ix-coordinators-team-sexual-harassment-education; *About ATIXA and Title IX*, ASS'N TITLE IX ADMINS., https://atixa.org/about/; *Title IX Coordinator Training*, NAT'L ASS'N COLL. & U. ATT'YS, http://www.nacua.org/ onlinecourses/title_ix_coordinator_training_2014/index.asp; *Who We Are*, D. STAFFORD & ASSOCIATES, http://www.dstaffordandassociates.com/; *Title IX Training*, THOMSON REUTERS, https://risk.thomsonreuters.com/ compliance-training-courses/title-ix-training; *Meet Valerie Simons, Director of Institutional Equity and Compliance, Title IX Coordinator*, U. COLO. (Sept. 12, 2014), http://www.colorado.edu/news/features/meet-valerie-simons-director-institutional-equity-and-compliance-title-ix-coordinator; *Student Rights and Responsibilities: Notes and Definitions*, GETTYSBURG C., http://www.gettysburg.edu/about/offices/college_life/srr/points_system/notes/index.dot (last visited Feb. 29, 2016); *Know Your Rights: Understanding Title IX for Campus Sexual Violence Victims*, VICTIM RTS. L. CTR. (2014), https://victimrights.org/sites/default/files/VRLC%20Know%20Your%20Rights-%20Title%20IX%20.pdf; *What You Need to Know About Title IX*, TITLE IX ON CAMPUS, http://title9.us/overview/#.VqBrxfkrKM8; ELON UNIV., ANNUAL SECURITY REPORT 8 (2013), http://www.elon.edu/docs/e-web/bft/safety/Elon%20University%20ASR%202013.pdf; *Creating a Culture of Consent*, HARV. U. OFF. OF SEXUAL ASSAULT PREVENTION & RESPONSE, http://osapr.harvard.edu/creating-culture-consent (last visited Oct. 23, 2016); SAVP Vassar, *How do I Ask For Consent?*, YOUTUBE (Apr. 28, 2014); *Where is Your Line: Consent is Sexy!*, U. WYO., http://www.uwyo.edu/stop/resources/10_stop_consent_sexy_booklet.pdf (last visited Oct. 24, 2016).

## II.   Summary of Expert Report and Opinions

16.   In my report, I provide my expert opinion on (1) the history of feminist theory and reform in sexual assault laws and, specifically, the narratives that reformers developed about victim credibility, trauma, underreporting, and under-conviction – narratives that have become particularly influential in the post-Dear Colleague Letter era; (2) the influence of these narratives and their "pro-victim" bias in the policies and procedures utilized by Defendant Denver University ("D.U.") in investigating and adjudicating the sexual misconduct allegations against John Doe. Ex. 2, Expert Rpt.  The latter opinion discusses how D.U.'s training incorporated gendered antirape narratives and identifies procedural flaws in the investigation that support an inference of bias.  *Id.*

### A.   The History and Impact of Feminist "Pro-Victim" Ideas and Reforms

17.   The first part of my report discusses the "politicized and gendered backdrop of the sexual assault issue." Ex. 2, Expert Rpt., at 2. I first address the influence of late twentieth century U.S. feminism on the development of sexual assault law and the consequent legal strategies to counter rape culture and underreporting, including adopting a presumption that women do not lie

about rape—a presumption that has more recently had a serious impact on campus sexual misconduct adjudications:

> [In the 1980s] police, prosecutors, and jurors (especially male ones) expected rape complainants to be chaste and tended to presume that women generally fabricated sexual assault claims.  Moreover, victims remained reluctant to come forward because of embarrassment, inconvenience, and fear of the process.  It was upon this backdrop that feminists and activists began to try to change norms and not just law.  To combat low reporting rates, feminist attempted to instill in police actors and the public at large a sense that women, in fact, do not lie about rape.  A contested but widely publicized statistic from women activists was that only two percent of rape accusations are false.  As a result, from a feminist perspective, any argument that a woman might be fabricating a claim of rape is presumptively taboo. . . . Ex. 2, Expert Rpt. at p. 4.

18.   I next address how these feminist narratives and strategies have influenced administrators, especially in the post-Dear Colleague Letter era:

> [G]iven the history of the gender politicization of rape law and especially sexual assault on college campuses, administrative investigators, who see their job, in part, as stopping the scourge of sexual assault on campus, may be inclined to presume that a female complainant is always truthful, despite evidence of inconsistency.  In addition, when they are not sure, such investigators may be inclined to err on the side of finding that sexual assault occurred.  *Id.*

I further opine that Title IX administrators "know that federal funding depends on being Title IX compliant, which often translates into 'zero tolerance' for sexual assault." *Id.* at p. 23.

## B.   The Influence of Feminist "Pro-Victim" Ideas and Reforms on D.U. Administrators and Policies

19.   My report identifies several feminist cultural narratives particularly relevant to this case: (1) the idea that it is improper to doubt sexual assault complainants and there should be a very strong presumption of complainants' credibility; (2) the notion that subjecting complainants to rigorous truth-testing is improper because it triggers trauma and deters reporting; and (3) the idea that universities that exonerate respondents or treat them too leniently participate in "rape culture" and fail to take the "epidemic" of campus rape seriously.  These narratives were incorporated into the training of OEO administrators at D.U.:

> According to Butler, the required training for his position at the University was a basic seminar from the for-profit Title IX training company ATIXA on the mechanics of Title IX investigations, a course that Butler characterized as "victim centered," that is, focused on victims rather than respondents.  (Butler D. 90, 92). Other courses offered or endorsed by the University and attended by various OEO staffers appear to be about

predisposing staff to a particular set of views on sexual assault and the inherent credibility of complainants and respondents. For example, trainings involve informing attendees that campus rapes are frequent, that only a minute percentage of rape claims are false, that campus rapes are "woefully underreported" (Butler D. 101), that accuseds are likely repeat offenders, and that inconsistent or incomplete complainant testimony is due to trauma and is therefore evidence that the complainant is telling the truth. (Grove D. 194-96; Olson D. 169-181; Butler D. 126-28, 157-58). Ex. 2, Expert Rpt. at pp. 4-5.

20.    My report notes that as part of a widespread reorganization of their Title IX rules and procedures after the Dear Colleague Letter, D.U. truncated and expedited its process to eliminate a hearing and make the internal OEO investigators the sole arbiters of the case ("the dual investigator mode1"):

> [T]he University instituted this stripped-down process sometime after 2012 as part of its larger efforts to reform the handling of sexual misconduct cases. Prior to that time, the University engaged dedicated investigators—sometimes one but often two—to collect documents, interview witnesses, and compile evidence, as it does under the current policy. However, under the former policy, investigators were not empowered to assess unilaterally the fruits of their own investigation. Rather, cases proceeded to a student conduct hearing board that analyzed the investigative reports and determined the existence a disciplinary violation. *Id.* at p. 3 (citing Grove).

### C.  Evidence of the Influence of Feminist "Pro-Victim" Ideas on D.U.'s Handling of John Doe's Case

21.    The second part, and bulk of, my report identifies flaws in the D.U. investigators' approach to John Doe's case that support an inference that the investigators, internalizing feminist ideas, harbored gendered presumptions about sexual assault complainants and respondents.  In identifying the flaws, I rely on basic rule-of-law principles of fairness and impartiality, for example: that investigations must be thorough; that investigations cannot be patently one-sided; that student conduct codes cannot be vague but must provide notice of what is prohibited; that sexual assault liability cannot be premised on a complainant's undisclosed intentions; that a finding of responsibility must be supported by credible evidence; and that standards of proof must be applied accurately.  I explain in the report that complying with baseline principles of legality is particularly important in a case involving a "dual investigator" model because:

> the investigators play the role of police, attorneys, judge, and jury. Investigators handle document collection, interview witnesses, and interrogate accuseds. Those investigators then decide which information to put into the report, which theories to pursue, and which arguments to address or ignore. They also interpret the substantive

law of sexual assault as set forth in the OEO Procedures and the meaning of standards of proof. Finally, the same investigators act as fact-finders, analyzing witness credibility and evidence to determine whether it is more likely than not that there was a disciplinary violation. Ex. 2, Expert Rpt. at pp. 2-3.

22.     In addition to identifying specific techniques used by the investigators that indicate bias, discussed below, my report notes that the trajectory of the entire investigation indicates of bias. My report notes, "Nearly all the investigative deficiencies, sloppy reasoning, and inconsistent application of credibility determinants benefit Complainant. Reading the D.U. Investigative Report, it is as if the investigators were under a directive to collect, manage, and analyze the evidence in the 'light most favorable to the complainant.'" *Id.* at p. 6. This is particularly troubling, given that under D.U.'s model, "cases are determined without the benefit of attorneys to marshal evidence and law, a hearing to test the veracity of witnesses, or even any reviewing body to provide some minimal oversight." *Id.* at p. 23.

23.     My report identifies several problems with the investigative methods that suggest the investigators internalized some of the above-described biases, for example, approaching the case more like complainant advocates than neutral factfinders responsible for discovering inculpatory and exculpatory material and scrupulously avoiding rigorous testing of only the complainant's claims:

a.     The investigators declined to clarify complainant's vague and conclusory statements about John Doe's requests for sex, despite that these requests were what purportedly coerced complainant into agreeing to the sex. *Id.* at p. 6-7.

b.     There is evidence that investigators prompted witnesses to make accusatory statements against John Doe. For example, witness J.M. initially states that when they arrived on the scene John Doe and his roommate were studying and it was not a party atmosphere, in direct contradiction to the complainant's characterization that John Doe was drinking gin and offering it to her. Later in his statement, J.M. remarks, "We may have been doing a little bit of drinking, but I don't remember for sure," suggesting that the investigators asked his particularly about drinking. Similarly, an issue in the case was whether the complainant chose to stay in John Doe's room in order to hook-up (per John Doe's account) or whether her friend group decided she should stay there because she was drunk (per complainant's account). Of this, J.M. initially stated that he "just left" and didn't "remember saying much to [the complainant] before leaving", except "goodbye." Later, his statement reads, "I don't remember who made the decision for her to stay in the room. It may have been a collective decision to leave her there because we were afraid she would get in trouble while trying to get back in the room," suggesting that the investigators invited J.M. to support the complainant's account by speculating. *Id.* at p. 8.

c.   The investigators discredited John Doe for deleting a reference to the drug Adderall in his official statement, despite that the fact whether Plaintiff offered, and the complainant accepted, the drug *after* the alleged assault is either irrelevant to whether assault occurred or possibly exculpatory (under the reasoning that such a friendly exchange cuts against a rape claim).  The investigators also discounted Doe's credibility on the strange ground that offering the complainant Adderall was somehow inconsistent with his claim that he brought her coffee at breakfast.  Finally, the investigators did not similarly fault the complainant for failing to mention accepting Adderall in her statement. *Id.* at pp. 8-10.

24.   My report identifies several instances where the investigators assessed credibility unfairly by ignoring credibility issues with the complainant, unequally applying credibility determinants in favor of the complainant and against John Doe, unfairly assessing the influence of intoxication, and assessing the credibility of claims based on a gendered notion of what is "natural":

a.   The investigators failed to take into account inconsistencies between the complainant's first vague and conclusory statement and her second more detailed statement, taken in response to further investigation.  I explain in the report:

> The first statement creates the image that Plaintiff woke Complainant up, immediately demanded that she have sex or get out, and repeated that threat "over and over" while Complainant protested.  The second statement indicates that there was a "casual conversation," a discussion of awkwardness and friends with benefits, a consideration of sexual positions, breaks in the sexual interaction, and music.  Indeed, Complainant's second statement reveals a negotiation, involving reasons why Complainant should have sex (he's been nice, she has other friends with benefits) and why she should not (she doesn't like friends with benefits, it's awkward). *Id.* at p. 11.

Instead, the investigators ignored the complainant's second statement altogether, indicating that they were reluctant to recognize evidence of the complainant's incredibility and adverse to evidence that contradicted her conclusion that what happened was coerced sexual assault.

b.   The investigators struggled to credit the complainant's account of why, if she felt coerced, she did not turn to John Doe's roommate who was a few feet away.  Despite the fact that complainant said that the roommate was there throughout the night and that she didn't remember him leaving, they simply accept her contradictory statement that she "didn't know he was in the room," without requiring any explanation as to why he would have suddenly left. *Id.* at 11-12.

c.   The investigators discounted John Doe and his roommate's claim that the complainant did not appear overly intoxicated on the ground that they had a self-protective motive to lie to cover up a violation of dorm alcohol rules; however, as the report notes, "[a]dmitting that a *visitor* came to the room *already* drunk is not an admission of drinking or having alcohol in the dorm."  At the same time, the investigators totally ignored the possibility that the complainant lied to avoid liability for an alcohol violation when she reported the assault, months later, to Graduate Director Mariano, describing it as occurring while she was drunk at an off-campus party.  Despite

that Mariano was clear that complainant "definitely said that it was a house party off campus," the investigators stretch to find Mariano not credible, dismissing his testimony as a speculative assumption.  This again demonstrates the lengths to which the investigators went to find the complainant credible and ignore exculpatory evidence. *Id.* at pp. 13-14.

d.  The investigators dismiss John Doe and his roommate's testimony regarding the incident as a product of collusion because they tried to help each other recall the events of a night several months in the past that they both actually observed.  At the same time, the investigators credit witness J.M.'s statements supporting the complainant's account as untainted by bias, ignoring the fact that J.M. stated that the complainant called him the night before his interview to tell him he would be interviewed, and that "[s]he told me her portrayal of the night" and "[t]he way I heard it from [Complainant] it was rape." *Id.* at p. 14.

e.  The investigators alternatively and contradictorily characterized the complainant as intoxicated and sufficiently sober when in service of inculpating the respondent.  As the report explains, "when it came to determining that Complainant was coerced, the investigators credit Complainant's and J.M.'s claim that she was highly intoxicated and reject Plaintiff and M.F.'s claim that she was not. When it comes to measuring the reliability of Complainant's observations, the investigators simply switch their factual findings and credit Plaintiff and M.F.'s observation that Complainant was not intoxicated." *Id.* at p. 15.

f.  The investigators concluded that the complainant had no motive to fabricate, despite that "the charge arose only after Complainant talked about the incident to her new boyfriend, R.H., who decided that it was rape" and that R.H. was the actual person who first reported the incident to Mariano. *Id.*  The complainant's claims tested the line between insistence and coercion, where every detail matters, and the investigators did not consider that "the event, as relayed to her new boyfriend six months afterwards, differed in meaningful ways from what actually happened." *Id.*  Instead, they reasoned that because complainant and John Doe were on good terms, she had no "malicious motive" to "willingly present a false version of the events."  As I note in my report, this adopts the view that complainants are invariably credible and accurate unless they fit into a narrow -- and virtually nonexistent -- category of vindictive liars. *Id.* at p. 16. Investigator Butler was so convinced of the accuracy of complainant's account, relayed to her boyfriend months after the fact, that he declined to follow up with a witness the complainant said she spoke to days after the incident.  He reasoned that it is irrelevant "how her friend *or even the complainant herself* characterize[d]" the incident shortly after it occurred. *Id.*

g.  The investigators credited the complainant's initial account of the incident, in which John Doe was the sole initiator of sexual activity and the complainant was a reluctant and passive acceptor, over John Doe's account, in which the complainant initiated much of the intimate contact and told him about prior partners, on the ground that the complainant's account was "more natural." *Id.* at pp. 16-18.  The investigators found "suspect" that the complainant engaged in "friendly banter" about sex and that John Doe was "shocked" at the complainant's sexual openness. *Id.* at p. 17. They further faulted John Doe for claiming that Jane Doe had talked about past casual sex partners as a sexist attempt to impugn her character, despite that Jane Doe admitted to discussing having past "friends with benefits." The investigator thus bought into the popular gendered and feminist notion that men are sexual aggressors solely responsible for ensuring that

sex is a product of free will.  During deposition, investigator Butler continued to doubt that John Doe was sexually inexperienced.  He expressed his disbelief "that a guy with no sexual history and didn't expect this interaction had a condom on hand." *Id.* at pp. 16-17.

25.     My report highlights the investigators' decision to broadly and arbitrarily interpret the coercion clause of D.U.'s sexual misconduct policy to encompass the complainant's claims against John Doe, supporting the inference that the investigators felt pressure to find guilt and that they were influenced by the reformist notion, discussed above, that "coercion" should be broadened to encompass many, if not most, forms of pressure that men place on women.  *Id.* at pp. 18-22. The investigator based the finding of coercion on: (1) repeated requests for sex in the face of refusal, and (2) John Doe's statement that the complainant owed him sex for using his bed, both of which were rendered more coercive by the complainant's intoxication.  *Id.* at pp. 18-19. However, the policy actually prohibits "unreasonable and persistent pressure to compel another individual to initiate or continue sexual activity against an individual's will." *Id.* at p. 19. It further specifies, "Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another.  . . .  Coercion can include a wide range of behaviors including intimidation, manipulation, threats, and blackmail.  Examples of coercion include threatening to disclose another individuals' private sexual information related to sexual orientation, gender identity, or gender expression and threatening to harm oneself if the other party does not engage in the sexual activity." *Id.* My report reasons:

> The list of behaviors and examples, therefore, are meant to narrow the world of "unreasonable" pressure by delineating acts that are at a particular level of gravity. Although these lists are non-exclusive, if the interpreter chooses to ignore them and define coercion as *anything* he thinks is unreasonable pressure, including things a magnitude different from threatened suicide and blackmail, the interpreter has rendered an entire of portion of the statute superfluous. . . . Thus, the most logical reading of the policy is that repeated requests for sex in the face of "clear" refusal are coercion only when the requests amount to intimidation, manipulation, or threats that affect the refusing party's free will to the degree a suicide threat or public sexual orientation outing would. The Report gives no hint as to why Plaintiff's repeated requests, even as described in Complainant's first statement, rose to that level of pressure. *Id.* at pp. 19-20.

26.     My report further notes that the investigators failed to account for evidence indicating that John Doe did not know, or have reason to know, the complainant felt coerced.  This supports that the investigators internalized a belief, held by certain feminist rape reformers, that a complainant's undisclosed internal feeling is the sole measure of whether sex is coerced or

consensual.  For example, investigator Grove explained that in order for the sex between Plaintiff and the complainant to have been uncoerced and consensual, the sex would have to be "something that she actually wanted."  *Id.* at p. 21.  The investigators failed to explore what language the complainant used to express that she was just "giving in" to being coerced as opposed to having been persuaded.  Moreover, the investigators failed to consider whether the complainant, even if intoxicated earlier in the evening, reasonably appeared sober to Plaintiff when he discussed and then had sex with her. *Id.*

27.     Finally, my report discusses the investigators' incorrect application of the preponderance of the evidence standard in a manner that made findings of guilt more likely, again indicating that investigators were responding to pressure to take campus rape seriously.  *Id.* at pp. 22-23. The investigators concluded, "These circumstances, along with the issues presented above regarding [Plaintiff's] overall credibility, lead the Investigators to find [Complainant's] version of the events to be more likely than the version presented by [Plaintiff]." *Id.* at p. 22. The report reasons:

> [B]y defining preponderance as a closed contest between two stories (one necessarily true and the other necessarily false), the investigators made the logical leap of saying that the better story was the *true* story.  This faulty logic allowed the investigators to avoid the legal obligation to look at all the possible scenarios and evidence thereof, fully analyze them for the believable and unbelievable parts, and determine exactly *what* more likely than not happened, and whether *that* constituted coercive sexual contact. . . .  This mistaken interpretation and application of the preponderance of the evidence standard is critical in this particular case because even assuming that everything Complainant said was true and everything Plaintiff said was false, the case for coercion is, at best, marginal.  *Id.* at p. 22.

## III.   **Experience and Qualifications**

### A.   **Education and Experience Prior to Teaching**

28.     In 1992, I graduated, *summa cum laude*, from the University of California at Berkeley, receiving a B.A. in Philosophy, with Departmental Honors and Phi Beta Kappa.

29.     I next attended Harvard Law School where I served as an Articles Editor for the Harvard Women's Law Journal and as General Editor of the International Law Journal. My course work at Harvard Law included the study of criminal law and procedure under Alan Dershowitz, for whom I served as a research assistant during the O.J. Simpson trial. I graduated, *magna cum laude*, in 1997.  I was a member of the criminal trial team, coached by Professor Charles Ogletree

as well as student lawyer in the Criminal Justice Institute.  I wrote *Pink Elephants* in the Rape Trial during my third year of law school and published it shortly after graduation.

30.    After law school I clerked for Federal District James L. King in the Southern District of Florida and assisted writing orders for his civil docket, including in discrimination cases.

31.    I then served as a felony trial attorney with the public defender service in Washington, D.C. and the federal public defender office in Miami, FL, handling a wide variety of criminal cases. In this position, I investigated sexual contact and sexual solicitation cases. As a result, I often spoke with victims of sexual assault.

**B.  Academic Positions and Teaching**

32.    I have been a full-time law professor since 2002.  I began my teaching career at Florida International University, where I was promoted to associate professor in 2005, receiving tenure in 2008, both of which were pursuant to the University's required peer-review process.  I then moved to University of Iowa with a promotion to full professor with tenure in 2009, granted through Iowa's peer-review tenure process.  I became a law professor at the University of Colorado in 2010 at the rank of tenured full professor, after vetting through a peer-review evaluation process.

33.    Except for leave semesters, I have taught criminal law courses every year since 2002, which address, among other things, rape, force and consent standards, intoxication, rape shield laws, victim credibility, and rape trial procedure. For the past four years, my courses have included a discussion of Title IX. I also teach seminars on criminal law, which include segments on rape, rape reform, sex offender treatment, Title IX, and campus rape. I have also taught investigative criminal procedure since the beginning of my teaching career and adjudicative criminal procedure several times.  Both courses engage deeply with issues of fair investigative and adjudicative procedure, including investigative bias, investigative technique, interrogation, discovery rules, speedy trial issues, fact-finding, presumptions, joinder and severance, burdens of proof, and appeal.

34.    I was a visiting professor at Harvard Law School during the Fall 2017 semester, where I taught two courses: (i) Criminal Law and (ii) Feminism and Crime Control. I have attached copies of my biography and the course descriptions to this declaration as Exhibit 12. As set forth in the course description, Feminism and Crime Control addresses the tension between feminist theory and criminal law reform, and includes a discussion of Title IX, including the theoretical and

legal issues impacting the debate on campus sexual assault. Approximately one quarter of Feminism and Crime Control's curriculum was related to campus sexual assault.

35.    Throughout the years, I have advised several student papers on rape issues, including papers on Title IX policy and procedure and sexual assault law reform.  My former students have gone on to be sex crimes prosecutors, Title IX personnel, university administrators, and public defenders, among other things.  I regularly comment on other law professors' scholarship regarding rape and Title IX issues, including engaging in peer review for journal publication and tenure.

## C.   The Boulder Faculty Assembly and American Law Institute

36.    For the past six years, I have been a member of the Boulder Faculty Assembly, which is the representative body of the faculty of the CU-Boulder campus. In January 2014, I was appointed to a seven-member ad hoc committee tasked with investigating whether the University, including its Office of Discrimination and Harassment ("ODH"), followed relevant policies and procedures in sanctioning Patti Adler, a sociology professor accused of sexual harassment and creating a hostile environment, related to her teaching methods in her course on the sociology of deviance, specifically a "prostitution skit."

37.    As a result of the accusations and ODH investigation, Adler was removed from teaching the course and encouraged to retire early. Adler's case garnered national attention in the media as thousands of students protested her removal. The ad hoc committee conducted an investigation, which included a review of the relevant ODH policies and procedures, and determined that administrators violated Adler's rights under University rules by, among other things, having ODH investigators secretly observe her class and failing to follow prescribed procedures. The ad hoc committee also recommended that the ODH revise its policies and procedures to provide more effective notice to individuals who are the subject of a "preliminary inquiry," and create clearer rules governing the operation of those inquiries.  I have attached a copy of the ad hoc committee's report to this declaration as Exhibit 13.

38.    I was also a member of the Boulder Faculty Assembly's Faculty Affairs Committee and, in that capacity, I investigated the case of David Barnett, a tenured philosophy professor who, in 2013, was fired for sending the University's Chancellor and Provost a letter, and report, he had prepared which objected to the manner in which the ODH investigated, and adjudicated, a sexual assault case against a former graduate student. The University characterized Barnett's letter as

retaliation against a rape complainant, a characterization rejected by the University Privileges and Tenure Committee, the faculty committee that presides over dismissal-for-cause grievances.  In 2014, I testified as an expert at the Privileges and Tenure Committee's hearing on Barnett's case on the issue of rape shield laws and specifically how they operate under federal law, Colorado law, and within the Title IX framework.

39.     In my capacity as a member of the Boulder Faculty Assembly, I have met several times with personnel from CU Boulder's Title IX office to discuss disciplinary procedures in sexual misconduct cases.  I have also met with CU Boulder Chancellor Phil DiStefano and CU Boulder Provost Russell Moore to discuss university disciplinary policies and procedures under Title IX.

40.     I have been an adviser to the American Law Institute's Model Penal Code sexual assault project for six years, where I have been involved in drafting discussions on force, consent, intoxication, rape shield, and other provisions related to the law of sexual assault.  I engaged in a debate with the project reporter over affirmative consent, which resulted in the article *Not Affirmative Consent*.

41.     I have been a part of the members consultative group to the American Law Institute's Project on Sexual and Gender-Based Misconduct on Campus, and in that capacity, have had various conversations with the reporter about campus policies and procedures, including investigative fairness, administrative bias, alternative dispute resolution, and collateral consequences of discipline.

### D. <u>Research and Writing</u>

42.     Since law school, a primary focus of my research and writing has been the relationship between feminist theory and criminal law reform addressing violence against women, including rape, sexual assault, domestic violence, intimate partner homicide, and sex trafficking.

43.     I have written the following articles relevant to Title IX enforcement and the impact of historical and current feminist discourse on college disciplinary policies and processes:

- ***Consent Confusion*, 38 CARDOZO L. REV. 415 (2016) (Ex. 9).**

- ***Anti-Rape Culture*, 64 U. KANSAS L. REV. 1027 (2016) (invited) (Ex. 6).**

- ***Rape Law Revisited*, 13 OHIO ST. J. CRIM. L. 279 (2016) (symposium editor's introduction) (peer reviewed and invited) (Ex. 7).**

- ***Not Affirmative Consent*, 47 MCGEORGE L. REV. 683 (2016) (invited response to Stephen Schulhofer, *Consent: What It Means to Get It and Why It's Time to Require It*) (Ex. 8).**

- *When Theory Met Practice: Distributional Analysis of Race and Gender in Criminal Law*, 83 FORDHAM. L. REV. 3211 (2015) (invited) (Ex. 14).

- *Neofeminism,* 50 HOUSTON L. REV. 1325 (2013) (Ex. 5).

- *A "Neo-feminist" Assessment of Rape and Domestic Violence Law Reform,* 15 J. RACE, GENDER & JUST. 583 (2012) (Ex. 15).

- *Rape, Feminism, and the War on Crime*, 84 WASH. L. REV. 581 (2009) (Ex. 4).

- *The Feminist War on Crime*, 92 IOWA L. REV. 741 (2007) (Ex. 16).

- *Pink Elephants in the Rape Trial: The Problem of Tort-type Defenses in the Criminal Law of Rape*, 4 WM. & MARY J. WOMEN & L. 203 (1998) (Ex. 3).

  ---------
- *Neofeminism*, *in* THE SAGE ENCYCLOPEDIA OF PSYCHOLOGY AND GENDER (2017).

- *Anti-Rape Culture* (reviewing Janet Halley, *Trading the Gavel for the Megaphone* (2014)), JOURNAL OF THINGS WE LIKE LOTS [JOTWELL] (Sept. 2015) (Ex. 17).

The first four articles, in bold, directly discuss current college codes and Title IX procedures.

44.   My work has been quoted in leading criminal law and other casebooks, including:

- Kadish, Schuhofer, Steiker, and Barkow, Criminal Law and Its Processes (10th ed. 2017).

- Kaplan, Weisburg, and Binder, Criminal Law: Cases and Materials (8th ed. 2016).

- Dressler & Garvey, Criminal Law: Cases and Materials (7th ed. 2015).

- The Oxford Handbook in Criminal Law (Dubber & Horne, eds. 2014).

- Bartlett, Rhode, and Grossman, Gender and Law: Theory, Doctrine, Commentary (7th ed. 2017).

- The Oxford Handbook of Gender and Conflict (Fionnuala Ní Aoláin et al, eds. 2018)

- Harris, Carbone, and Tietelbaum, Family Law (5th ed. 2014)

- Martha Chamallas, Introduction to Feminist Legal Theory (3d ed. 2013).

45.     The American Law Institute's Project on Sexual and Gender-Based Misconduct on Campus cited my article, *The Feminist War on Crime*, 92 IOWA L. REV. 741, 796-797 (2007), in their recent report. I have attached a true and correct copy of the excerpted pages to this declaration as Exhibit 18. I have also been cited in the ALI's draft *Model Penal Code: Sexual Assault and Related Offenses*. I have attached a true and correct copy of the excerpted pages to this declaration as Exhibit 19.

46.     I co-authored and published a textbook on comparative criminal procedure, *Practical Global Criminal Procedure,* which examines and analyzes criminal procedure, including investigation and interrogation techniques utilized by police, through a case study involving violations of procedure in the investigation of a homicide case. The book also discusses criminal trial processes in three countries, including an extensive comparison of inquisitorial and adversarial models of procedure. Ex. 1, Curriculum Vitae.

47.     I was the organizer and editor of a symposium entitled, *Rape Law Revisited*, for the peer-reviewed journal, the Ohio State Journal of Criminal Law in 2016. Articles in the symposium extensively discuss Title IX, for example an article entitled *The Criminalization of Title IX.*

**E.   Speaking Engagements**

48.     I am frequently invited to give lectures and presentations about Title IX and related issues. *See* Ex. 1, Curriculum Vitae. The following are recent lectures concerning sexual misconduct on college campuses:

- On January 31, 2018, I presented a talk to the University of Kansas law faculty on the history of feminist rape reform from the 1880s to the 1990s, relating the various laws, issues, cultures, legal reforms, and feminist ideas to some of the sexual assault issues of the day, including Title IX reforms and the #metoo movement.

- On November 8, 2017, I presented a talk to Boston University law students in a gender race and law seminar on the history of feminist rape reform and its relation to current concepts of sexual harm, sexual consent, and gender justice within the campus rape and #metoo discussion.

- On November 8, 2017, I presented a talk to Harvard law students in Professor Paul Butler's Black Lives Matter and the Law course on the history of feminist rape reform, how feminist ideologies have influenced discourse on campus rape and sexual harassment in recent years and months, and the impact such discourse on racial justice concerns.

- On October 16, 2017, I spoke to students at an event organized by Harvard Law School's American Constitution Society and Women's Law Association about consent and affirmative consent standards in criminal laws and university policies, as well as current Title IX controversies.

- On September 21, 2017, I participated in the University of Kentucky Center for Research on Violence Against Women's 2017 National Conference, *Campus Responses to Sexual Misconduct: Pausing to Consider the Implications*. At the conference, I gave a lecture on affirmative consent.

- In April 2016, I participated in the Stanford Journal of Criminal Law Symposium, *Radical Ideas Forum: Sexual Assault on College Campuses*, discussing Title IX issues, including trauma, due process, climate surveys, and college code definitions of rape.

- In April 2016, I was invited to, and presented, a "Think! Talk" for the Center for Values and Social Policy at CU Boulder to a large audience of undergraduates, graduate students, and community members, discussing Title IX issues, including trauma, due process, climate surveys, and college code definitions of rape.

- In February 2016, I was invited to present to the Ohio State University Law School faculty, where I spoke on Title IX issues, including trauma, due process, climate surveys, and college code definitions of rape.

- In January 2016, I was part of the American Association of Law Schools' Hot Topic Panel, *Grappling with Campus Rape*, at which I discussed Title IX issues, including trauma, due process, climate surveys, and college code definitions of rape. That panel and my comments were covered by the national press.

- In November 2015, I debated Professor Stephen Schulhofer, reporter for the MPC Sexual Assault Project, on the topic of affirmative consent at the U. Pacific Law Review Symposium, *Sexual Crimes and Offenses in an Era of Reform*.

- In October 2015, I gave a presentation at the Kansas Law Review Symposium on Sexual Assault discussing Title IX issues, including trauma, due process, climate surveys, and college code definitions of rape.

- In September 2014, I was a keynote speaker at Harvard Law School's "Teach-In," *Title IX and Campus Rape Policy Reform* where I spoke about Title IX controversies and specifically the Adler and Barnett cases at CU Boulder.

49.   I have also given the following recent lectures and presentations about affirmative consent:

23

- In June 2017, I presented a paper on affirmative consent in criminal law and college codes at the International Conference of Law and Society in Mexico City.

- In November 2016, I discussed my work on affirmative consent and campus rape issues at the Vanderbilt Criminal Law Workshop.

- In October 2016, I presented a paper on affirmative consent in criminal law and college codes at the Emory Law School Vulnerability and the Law Workshop.

- In January 2016, I discussed affirmative consent standards in criminal and college codes at the Association of American Law Schools Symposium on Sexual Assault

- In November 2015, I presented a paper on affirmative consent in criminal law and college codes at the Florida International University School of Law faculty colloquium.

- In October 2013, I gave a lecture to the Harvard Defenders on feminism and criminal law, with a focus on rape law and policy.

- In June 2013, I presented a talk entitled "Rape Costs" on the issue of rape culture and Title IX at the Harvard Global Law and Policy Conference.

I declare under the penalty of perjury that the foregoing is true and correct, pursuant to Title 28, United States Code, Section 1746.

Dated: February 19, 2018

_____

AYA GRUBER