IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 16-cv-00152-PAB-KMT

JOHN DOE,

      Plaintiff,

v.

UNIVERSITY OF DENVER;
UNIVERSITY OF DENVER BOARD OF TRUSTEES;
REBECCA CHOPP, individually and as agent for University of Denver;
KRISTIN OLSON, individually and as agent for University of Denver;
JEAN MCALLISTER, individually and as agent for University of Denver;
KATHRYNE GROVE, individually and as agent for University of Denver; and
ERIC BUTLER, individually and as agent for University of Denver,

      Defendants.

---

## ORDER

---

    This matter is before the Court on Defendants' Motion for Summary Judgment [Docket No. 68], Plaintiff's Motion for Leave to Submit Supplemental Authority [Docket No. 108], Plaintiff's Second Motion for Leave to Submit Supplemental Authority [Docket No. 110], and Defendants' Motion to Exclude Expert Testimony [Docket No. 117]. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## I. BACKGROUND[1]

    Plaintiff John Doe enrolled at the University of Denver ("DU"), a private

---

[1]The following facts are undisputed unless otherwise noted. The Court previously granted plaintiff permission to proceed under the pseudonym "John Doe" for purposes of this lawsuit. Docket No. 32. Additionally, this order will refer to the complainant as "Jane Doe" and to the student witnesses by their initials.

university, in the fall of 2014 as an undergraduate student. Docket No. 68 at 2, ¶¶ 1-2. On April 15, 2015, DU Graduate Resident Director Jeffrey Mariano received a complaint that plaintiff had sexually assaulted a female student, Jane Doe. *Id.*, ¶ 4. Mr. Mariano notified Kathryne Grove, then-Director of the Office of Equal Opportunity ("OEO") and Title IX coordinator, regarding the complaint. *Id.* On May 1, 2015, Ms. Grove and Eric Butler, an OEO investigator, met with Ms. Doe for an informational meeting regarding the OEO process. *Id.* at 3, ¶ 6.[2]

DU began its investigation into Ms. Doe's complaint on May 5, 2015. *Id.*, ¶ 7. On that day, Ms. Grove and Mr. Butler interviewed Ms. Doe regarding the incident. *Id.* On May 11, 2015, Ms. Grove and Mr. Butler interviewed plaintiff's roommate, M.F. *Id.*, ¶ 9.

On May 12, 2015, Mr. Butler sent plaintiff a letter notifying him that "an expression of concern ha[d] been filed that [he had] allegedly committed the following prohibited conduct: Non-Consensual Sexual Contact." *Id.* at 3-4, ¶ 10; *see also* Docket No. 68-30. The letter further informed plaintiff of his rights and responsibilities and provided him with a list of resources. Docket No. 68 at 3-4, ¶ 10; Docket No. 68-30 at 5-8.[3] On May 13, 2015, Ms. Grove and Mr. Butler interviewed J.M., a mutual

---

[2]Plaintiff admits this allegation, but notes that it is not supported by the testimony cited in defendants' summary judgment motion. Docket No. 86 at 1, ¶ 6. Plaintiff raises the same objection in response to other undisputed material facts asserted by defendants. *See, e.g.*, *id.* at 2-3, ¶¶ 13, 14, 20. To the extent plaintiff admits defendants' allegations, the Court considers the allegations to be undisputed for purposes of summary judgment.

[3]Defendant denies that the letter contained "respondent-specific" resources. Docket No. 86 at 2, ¶ 10. Additionally, he notes that "Defendants' characterizations" of the letter are not supported by the deposition testimony cited. *Id.* It is not clear to the

acquaintance of plaintiff and Ms. Doe who was in plaintiff's dorm room on the night of the incident. Docket No. 68 at 4, ¶ 11.

Ms. Grove and Mr. Butler conducted an informational interview with plaintiff on May 20, 2015, which was attended by plaintiff's attorney. Docket No. 85 at 2, ¶ 12. On May 27, 2015, Ms. Grove and Mr. Butler again interviewed plaintiff. *Id.*, ¶ 13. At that time, plaintiff provided the investigators with a list of witnesses. *Id.* On May 28 and 29, 2015, the investigators interviewed (1) Jeffrey Mariano, the Graduate Resident Director to whom the sexual assault complaint was initially reported, and (2) R.H., the student who had accompanied Ms. Doe when she first reported the sexual assault. *Id.* at 4-5, ¶ 15. Supplemental interviews of Ms. Doe, Mr. Mariano, plaintiff, and M.F. were conducted between May 29, 2015 and June 16, 2015. *Id.* at 5, ¶ 16. After each interview, Ms. Grove and Mr. Butler would provide the interviewee with a Summary Statement and give him or her an opportunity to review the statement and make changes to ensure its accuracy. *Id.* at 3, ¶ 8.

On June 26, 2015, Ms. Grove and Mr. Butler issued their preliminary report to plaintiff and Ms. Doe. *Id.* at 5, ¶ 18. The preliminary report did not contain the investigators' findings. *Id.* Mr. Butler informed plaintiff and Ms. Doe that they could submit additional information or corrections to him via e-mail. *Id.*, ¶ 19. Plaintiff requested a "slight edit" to the report on July 3, 2015. *Id.*

---

Court what portion of the allegation plaintiff believes to be unsupported. In plaintiff's deposition, which defendants cite in their motion, plaintiff testified that Mr. Butler informed him via e-mail of Ms. Doe's complaint and provided him with a "sheet of resources." Docket No. 68-1 at 5, 21:5-22:9. Additionally, the content of the letter, which plaintiff does not deny receiving, speaks for itself. *See* Docket No. 68-30.

The investigators issued their final report to Kristin Olson, DU's Director of Student Conduct, on July 14, 2015. *Id.*, ¶ 20; Docket No. 67-1 at 1. The report states that "[t]he investigators find it more likely than not that [John's] actions on the night of October 9, 2014 resulted in non-consensual sexual contact with [Jane] by means of coercion in violation of the University's Equal Opportunity Policies." *Id.* at 6, ¶ 21. The parties dispute whether Jean McAllister, who began her employment as DU's Director of Title IX on June 1, 2015, reviewed or provided any input on the report prior to its issuance. *See id.*, ¶ 24 (stating that Ms. McAllister only read the report as a "training exercise"); Docket No. 86 at 3, ¶ 24 (stating that "McAllister reviewed the final report prior to its issuance and could not recall whether she provided thoughts on the report to Grove or Butler"). The parties also dispute whether defendant Rebecca Chopp, a chancellor of the university, had any role in plaintiff's case. *See* Docket No. 68 at 9, ¶ 35 (stating that "Chancellor Chopp had no involvement in any aspect of John's investigation, outcome determination, or appeal"); Docket No. 86 at 5, ¶ 35 (stating that "Chopp had significant influence on DU's policies and procedures").

On July 17, 2015, Ms. Olson sent a letter to plaintiff and Ms. Doe informing them that an Outcome Council would be convened as a result of the investigators' finding of responsibility. Docket No. 68 at 7, ¶ 28. The letter listed the names of the council members and informed plaintiff and Ms. Doe that they had the "right to object to the participation of a member of the Outcome Council based on a demonstrable significant bias" by sending Ms. Olson "supporting information" within twenty-four hours. *Id.*, ¶¶ 28-29. At that time, plaintiff did not have a reason to believe that any of the members

of the Outcome Council – Molly Hooker, Matthew Rutherford, and Ms. Olson – were biased against him based on his gender.  *Id.* at 8, ¶ 30; Docket No. 86 at 5, ¶ 30.

The Outcome Council convened on July 20, 2015.  Docket No. 68 at 8, ¶ 32.  On July 22, 2015, the Council notified plaintiff by phone and written letter of its determination that it was "in the University's best interest" to dismiss plaintiff from DU.  *Id.*  Plaintiff appealed the Council's determination on July 27, 2015, arguing that "[t]here were substantial procedural errors in [the] investigation that would have likely altered the course of the investigative findings and ultimate outcomes."  Docket No. 68-6 at 1; Docket No. 68 at 8-9, ¶ 33.  Among these errors were "(1) [the] failure to include information provided by [plaintiff] in the investigative report; (2) [the] failure to properly investigate and collect all available information; and (3) [the] failure to ensure proper investigatory techniques were followed and/or give weight or consideration to [the] fact that they were not followed."  Docket No. 68-6 at 1; Docket No. 68 at 8-9, ¶ 33.[4]

On July 30, 2015, Barbara Wilcots, Associate Provost of Graduate Studies, sent plaintiff a letter informing him that his appeal was denied and providing an explanation for the denial.  Docket No. 68 at 9, ¶ 34; Docket No. 68-7 (denial letter).  The letter stated that this was a "final decision, with no further route of appeal."  Docket No. 68 at 9, ¶ 34; Docket No. 68-7 at 2.

Plaintiff filed his complaint in this case on January 21, 2016.  Docket No. 5.  He asserts claims for: (1) violation of his rights under Title IX of the Education Amendments

---

[4]Plaintiff admits that "he submitted an appeal that included the violations cited but clarifies that he submitted further information beyond these three in particular."  Docket No. 86 at 5, ¶ 33.  Plaintiff does not specify what "further information" he refers to.

of 1972, 20 U.S.C. § 1681 *et seq.*; (2) violation of his procedural due process rights under the Fourteenth Amendment of the U.S. Constitution; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) promissory estoppel; (6) negligence; and (7) a declaratory judgment directing, among other things, that "the outcome and findings made by University of Denver be reversed," that plaintiff's "disciplinary record be expunged," and that plaintiff be "readmitted to [the] University of Denver for the Spring 2016 semester." Docket No. 5 at 39-57.

Though not addressed in depth in the parties' statement of undisputed facts, plaintiff's claims hinge, in part, on DU's response to an April 4, 2011 "Dear Colleague" letter ("DCL") issued by the Department of Education's Office for Civil Rights ("OCR"). Noting the "deeply troubling" statistics regarding sexual violence on college campuses, the DCL purported to provide "additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence." Russlynn Ali, Assistant Sec'y for Civil Rights, *Dear Colleague Letter*, at 2 (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (last visited Mar. 13, 2018). It also identified "remedies that schools and OCR [could] use to end such conduct, prevent its recurrence, and address its effects." *Id.* Another court in this district has noted that the DCL "had two major effects": (1) "it generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations"; and (2) it "announced OCR's view that school investigators should apply a preponderance-of-the-evidence standard when determining whether a sexual assault accusation is founded." *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1067 (D. Colo. 2017). Plaintiff's claims are predicated

6

in part on the fact that DU revised certain of its procedures for addressing sexual misconduct in response to the DCL. Docket No. 85 at 8-11; Docket No. 95 at 4, ¶ 10.

On May 5, 2017, defendants moved for summary judgment on all claims. Docket No. 68. After briefing on the motion was complete, plaintiff filed two motions to supplement his response to defendants' motion for summary judgment. Docket Nos. 108, 110. On January 29, 2018, defendants moved to exclude the expert testimony of Aya Gruber and Hanna Stotland under Fed. R. Civ. P. 702. Docket No. 117.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."

7

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III. ANALYSIS

### A. Due Process Claim

Defendants argue that they are entitled to summary judgment on plaintiff's Fourteenth Amendment Due Process claim because defendants are not state actors. Docket No. 68 at 10-11.

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It is well established that the Due Process Clause applies only to state actors. *See Browns v. Mitchell*, 409 F.2d 593, 594 (10th Cir. 1969) (stating that "[i]t is axiomatic that the due process provisions of the Fourteenth Amendment

proscribe state action only"); *see also Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (noting "line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not"). However, courts have recognized an exception to this rule when "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Academy*, 531 U.S. at 295 (internal quotation marks omitted). Such a nexus may be found where (1) the "challenged activity . . . results from the State's exercise of coercive power"; (2) "the State provides significant encouragement, either overt or covert" for the challenged activity; (3) the "private actor operates as a willful participant in joint activity with the State"; (4) a "nominally private entity . . . is controlled by an agency of the State"; (5) the private entity "has been delegated a public function by the State"; and (6) the private entity is "entwined with governmental policies." *Id.* at 296; *see also Wittner v. Banner Health*, 720 F.3d 770, 775-78 (10th Cir. 2013) (identifying four "tests" for determining whether private conduct constitutes state action for purposes of § 1983).[5]

---

[5]*Wittner* addressed the "under color of state law requirement" for actions brought under 42 U.S.C. § 1983. Although the statutory "under color of state law" requirement and the Fourteenth Amendment "state action" requirement are analytically distinct, they are also overlapping. *See Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922, 929, 935 n.18 (1982) (explaining that, "although . . . conduct satisfying the state-action requirement of the Fourteenth Amendment satisfies the statutory requirement of action under color of state law, it does not follow from that that all conduct that satisfies the under-color-of-state-law requirement would satisfy the Fourteenth Amendment requirement of state action"); *Pino v. Higgs*, 75 F.3d 1461, 1464 (10th Cir. 1996) (stating that "the 'under color of state law' and 'state action' elements of a § 1983 claim, although similar and overlapping, denote two separate areas of inquiry" (internal quotation marks omitted)). Accordingly, courts applying the "under color of state law" requirement have often looked to case law interpreting the Fourteenth Amendment's state action requirement for guidance, and vice versa. *See, e.g.*, *Rendell-Baker v.*

Plaintiff argues that there are factual disputes precluding summary judgment on the issue of whether "DU was transformed into a state actor when it became entwined with the federal government, which coerced it into adopting punitive Title IX policies and procedures under threat of legal action and the loss of federal funding."  Docket No. 86 at 8.  Plaintiff suggests that the state action requirement is met by a combination of (1) DU's receipt of federal funding, and (2) the coercive impact of the Department of Education's Dear Colleague Letter ("DCL") on DU's policies and procedures surrounding campus sexual assault.  *See id.* at 9-11.[6]

_____

*Kohn*, 457 U.S. 830, 838 (1982) (noting that "[t]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'").  This is particularly true where deprivations of rights under the Fourteenth Amendment are alleged by way of a § 1983 action.  In such circumstances, the requirements of "state action" and "under color of state law" converge.  *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 49 n.8 (1999).

[6]The Court notes that plaintiff's arguments pertain only to DU's entwinement with the federal government.  The Tenth Circuit has observed that "[i]nasmuch as . . . 42 U.S.C. § 1983 [] is concerned only with state action and does not concern itself with federal action we lay to one side as entirely irrelevant any evidence concerning the participation of the federal government in the affairs of the University."  *Browns v. Mitchell*, 409 F.2d 593, 595 (10th Cir. 1969).  Like § 1983, the Fourteenth Amendment applies only to state actors.  *See Bartkus v. Illinois*, 359 U.S. 121, 124 (1959); *Lyle v. Dodd*, 857 F. Supp. 958, 966 (N.D. Ga. 1994) ("It is axiomatic that the Fifth Amendment due process clause applies only to the federal government, while the Fourteenth Amendment due process clause applies to the states.").  Accordingly, it is not clear why DU's receipt of federal funding and compliance with Title IX standards is relevant to plaintiff's Fourteenth Amendment claim.  *See Kitchens v. Bowen*, 825 F.2d 1337, 1340 (9th Cir. 1987) (noting that "the standards utilized to find federal action for purposes of the Fifth Amendment are identical to those employed to detect state action subject to the strictures of the Fourteenth Amendment." (internal quotation marks and brackets omitted)).  Ultimately, the Court need not address the issue because there are alternative grounds for dismissing plaintiff's due process claim.

As an initial matter, DU's receipt of federal funding is insufficient, standing alone, to transform it into a state actor for purposes of plaintiff's due process claim. *See Rendell-Baker*, 457 U.S. at 840 (holding that a school's receipt of government funds did not convert its discharge decisions into actions of the state, even though the school derived almost all of its income from public funding); *Wittner v. Banner Health*, 720 F.3d 770, 776 (10th Cir. 2013) ("Without a showing of coercion, even substantial state funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business." (internal quotation marks and brackets omitted)); *Tsuruta v. Augustana Univ.,* 2015 WL 5838602, at *2 (D.S.D. Oct. 7, 2015) (finding that private university's receipt of Title IX funding, standing alone, was insufficient to satisfy state action requirement).

The next issue is whether the DCL – and the requirement that DU comply with Title IX standards as a condition of receiving federal funds – is sufficiently coercive to establish a "nexus between the State and the challenged action." *Brentwood Academy*, 531 U.S. at 295. A private entity may be considered a state actor for purposes of the Fourteenth Amendment if the "State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice [to take the challenged action] must in law be deemed to be that of the State." *Am. Mfrs. Mutual Ins. Co.*, 526 U.S. at 52. On the other hand, the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Id.* (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S.

345, 350 (1974)) (internal quotation marks and brackets omitted)).

The court in *Heineke v. Santa Clara Univ.*, 2017 WL 6026248 (N.D. Cal. Dec. 5, 2017), recently addressed the DCL in a case involving the suspension of a university professor for sexual harassment.  The professor sought to avoid dismissal of his due process claims against Santa Clara University ("SCU"), which he alleged was a private Jesuit institution, by arguing that the university's conduct was compelled by state and federal law.  *Id.* at *15-16.  The professor asserted that (1) SCU's Gender-Based Discrimination and Sexual Misconduct Policy "was created to maintain compliance with Title IX"; (2) "SCU was obligated by law to conduct an investigation into Doe's complaint"; and (3) "SCU risk[ed] losing its federal funding if it [did] not comply with Title IX."  *Id.*  The court rejected the professor's argument, concluding that it "amount[ed] to a contention that a generally applicable statutory requirement, without more, . . . is sufficient to hold a private employer responsible as a governmental actor."  *Id.*  The court noted that the Ninth Circuit had already considered and rejected the argument in *Sutton v. Providence St. Joseph Medical Ctr.*, 192 F.3d 826 (9th Cir. 1999), a case involving a private medical center.  *See id.* at *17.  There, the Ninth Circuit held that the defendant's enforcement of a federal law requiring individuals to provide their social security numbers as a condition of employment did not satisfy the state action requirement for purposes of the plaintiff's claim under the Religious Freedom Restoration Act ("RFRA").[7]  The court engaged in an extensive analysis of prior case

_____

[7]Although the plaintiff asserted his claim directly under the RFRA, the Ninth Circuit held that "the judicial interpretation of the phrase 'acting under color of law,' as used in 42 U.S.C. § 1983, applie[d] equally" in the context of plaintiff's RFRA action.  *Id.* at 835.

12

law applying the state action doctrine and concluded that the Supreme Court had never held "that governmental compulsion in the form of a general statute, without more, is sufficient to transform every private entity that follows the statute into a governmental actor." *Id.* at 839.[8] The court further reasoned that such a rule would be untenable: not only would it "convert every employer . . . into a governmental actor every time it complies with a presumptively valid, generally applicable law," thereby subjecting employers to liability "even though they bear no real responsibility for the violation of rights arising from the enactment of the laws," but it would also "emasculate the government action concept." *Id.* at 838-39 (internal quotation marks and brackets omitted).

The Court finds this reasoning persuasive. As in *Heineke*, plaintiff does not argue that the "mere fact that [DU] conducted an investigation, as required by law, . . . deprived him of due process." *Heineke*, 2017 WL 6026248, at *16. Nor does he provide any argument or evidence that the Title IX standards themselves required DU to engage in the specific conduct of which he complains. *See Heineke*, 2017 WL 6026248, at *16 (noting that plaintiff did not "allege that any state or federal law, including Title IX, compelled SCU to conduct the investigation in a certain way or come to any particular decision about his termination"); *Doe v. Case W. Reserve Univ.*, 2017 WL 3840418, at *9 (N.D. Ohio Sept. 1, 2017) (finding that de-funding penalties for failure to comply with Title IX did not compel private university's conduct, as required by

---

[8]Importantly, the Ninth Circuit noted that "[t]he compulsion analysis originated in cases in which the government itself, not a private entity, was the defendant." *Id.* at 836. The court suggested that different considerations govern the state action requirement when the defendant is a private actor. *See id.* at 838-43.

Fourteenth Amendment's state action requirement, where there were no allegations that "the federal government participated in the proceedings against Plaintiff or dictated the specific finding of responsibility"); *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015) (noting that, "for Fifth Amendment protections to apply, the government must have compelled the act of which Plaintiff complains," and finding that state action requirement was not met in case because Plaintiff did not "allege that the government deprived [the university] of its autonomy to investigate and adjudicate charges" (internal quotation marks omitted)); *cf. Pino v. Higgs*, 75 F.3d 1461, 1466 (10th Cir. 1996) (finding that state action requirement was not met for purposes of § 1983 because, although state involuntary commitment statute dictated procedure that admitting physician must follow in conducting an emergency mental health evaluation, the state had "no authority" and could not require physician to conduct examination of particular patient).[9]   In fact, the DCL instructs universities that their inquiry into Title IX complaints "must in all cases be prompt, thorough, and impartial" and that complainants and respondents must be treated equally throughout the investigatory process.  Russlynn Ali, Assistant Sec'y for Civil Rights, *Dear Colleague Letter*, at 5, 11-13 (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (last visited Mar. 13, 2018).  To the extent plaintiff suggests that

---

[9]Although plaintiff argues that "DU risked a potential financial penalty from the [Department of Education] if they found in favor of John Doe," *see* Docket No. 86 at 13, that is not the same as asserting that the Title IX regulations compelled a finding of responsibility with respect to plaintiff for purposes of the state action requirement. Moreover, plaintiff's argument is disingenuous.  Although it is true that schools may incur financial penalties if they fail to comply with Title IX requirements, plaintiff has provided no evidence that liability is imposed based solely on a finding of non-responsibility in a particular case.

defendants were acting contrary to the policies and procedures articulated in the DCL, his state action claim fails.  *See Lugar*, 457 U.S. at 940 (holding that petitioner could not establish state action where "respondents were acting contrary to the relevant policy articulated by the State" and without "the authority of state officials").  Otherwise, plaintiff's argument reduces to a contention that DU's compliance with a facially valid and generally applicable regulatory scheme is sufficient to establish state action for purposes of the Fourteenth Amendment.  The Court finds such a result untenable.

Finally, although the Tenth Circuit has yet to address the issue, a majority of courts have determined that a private university's compliance with Title IX regulations does not transform it into a state actor for purposes of the Fourteenth Amendment. *See, e.g.*, *Faparusi v. Case W. Reserve Univ.*, 711 F. App'x 269, 275-76 (6th Cir. Oct. 4, 2017) (unpublished); *Heineke*, 2017 WL 6026248, at *17; *Tsuruta*, 2015 WL 5838602, at *2-3; *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *9; *see also Doe v. Case W. Reserve Univ.*, 2017 WL 3840418, at *10 ("Despite extensive research, the Court has not found a single case in which a court has determined that a private school's compliance with Title IX's regulations make that entity a state actor for purposes of a Fourteenth Amendment due process claim.").  Plaintiff does not identify any cases reaching the opposite conclusion.[10]

---

[10]The two cases plaintiff relies upon are inapposite.  *Doe v. Brown University*, 166 F. Supp. 3d 177 (D.R.I. 2016), does not address the state action requirement under the Fourteenth Amendment because the plaintiff in that case did not assert a due process claim.  And in *Brentwood Academy*, the court held that the regulatory activity of a not-for-profit interscholastic organization satisfied the state action requirement where the association's membership consisted primarily of public schools, the association's employees were "treated as state employees to the extent of being eligible for membership in the state retirement system," and the association enforced rules and

Because plaintiff cannot establish a genuine factual dispute as to whether DU is a state actor for purposes of the Fourteenth Amendment, defendants are entitled to summary judgment on plaintiff's due process claim.

Plaintiff filed two motions for leave to submit supplemental authority. In the first, Docket No. 108, plaintiff asks the Court to consider a recent district court decision finding that the plaintiff was likely to succeed on the merits of his due process claim against Pennsylvania State University and granting his motion for a temporary restraining order and preliminary injunction. *See Doe v. Penn. State Univ.*, 276 F. Supp. 3d 300, 313, 315 (M.D. Pa. 2017). The case is inapposite for two reasons. First, the case addresses a motion for a temporary restraining order and preliminary injunction, not a motion for summary judgment. Second, the court's analysis focuses on the plaintiff's due process claim against a public university. The decision therefore does not address either the state action issue central to plaintiff's due process claim in this case or the requirements of Title IX.

In the second motion, Docket No. 110, plaintiff calls the Court's attention to a "Dear Colleague" letter issued by the Department of Education's Office for Civil Rights ("OCR") on September 22, 2017. Plaintiff argues that the letter impacts the Court's resolution of plaintiff's due process claim because it states that the April 2011 letter "required" schools to adopt certain procedures with regard to Title IX complaints. *See id.* at 2. Plaintiff misleadingly suggests that the OCR, in its 2017 letter, "noted that the April 4, 2011 Dear Colleague Letter placed 'improper pressure upon universities' which

---

regulations reviewed and approved by the State Board of Education. *See Brentwood Academy*, 531 U.S. at 291-93, 298, 300.

16

resulted in the establishment of procedures for resolving sexual misconduct allegations which 'lack the most basic elements of fairness and due process.'" *Id.* at 2-3. In fact, the OCR was merely citing the criticisms of legal commentators. *See* Docket No. 110-1 at 2.

The 2017 "Dear Colleague" letter does not alter the Court's conclusion that plaintiff has failed to satisfy the state action requirement for his due process claim. A private entity's compliance with government regulations does not, standing alone, transform a public entity into a state actor for purposes of the Fourteenth Amendment. The fact that the September 2017 OCR letter uses the word "required" to characterize the effect of the April 2011 guidance does not change this conclusion, as regulatory compliance is generally mandatory. Moreover, because the 2017 letter was issued after the events giving rise to this lawsuit, it has no bearing on whether the Title IX regulations had such a coercive effect in 2015 as to render DU's actions "fairly attributable" to the government. *See Rendell-Baker*, 457 U.S. at 838 (noting that "ultimate issue" is whether "the alleged infringement of federal rights [was] fairly attributable to the State" (internal quotation marks omitted)).

Accordingly, although the Court will grant plaintiff's requests for leave to submit supplemental authority, the authority submitted does not change the Court's analysis or conclusions as to the merits of plaintiff's due process and Title IX claims.

### B.  Title IX Claim

Defendants argue that summary judgment is warranted in their favor on plaintiff's Title IX claim because "the undisputed facts show that sexual bias was not a motivating

factor behind DU's finding of responsibility in its investigation of the alleged sexual-assault complaint against [plaintiff]."  Docket No. 68 at 13.

Title IX of the Civil Rights Act states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  In *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), the seminal case addressing Title IX claims based on the imposition of university discipline, the Second Circuit identified two categories of claims brought by "[p]laintiffs attacking a university disciplinary proceeding on grounds of gender bias": (1) claims of "erroneous outcome," where the plaintiff alleges that he or she "was innocent and wrongfully found to have committed an offense"; and (2) claims of "selective enforcement," where the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  *Id.* at 715; *see also Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1073-74 (D. Colo. 2017) (recognizing "erroneous outcome" and "selective enforcement" theories set forth in *Yusuf*).[11]  Under either theory, the plaintiff must show that "gender [was] a motivating factor in the decision to discipline."  *Yusuf*, 35 F.3d at 715; *see also Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1074 ("While

_____

[11]Courts have recognized two additional theories of liability under Title IX, which plaintiff does not assert in this case: (1) "deliberate indifference, " under which a plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct"; and (2) "archaic assumptions," which "has been applied where plaintiffs seek equal athletic opportunities" and "finds discriminatory intent in actions resulting from classifications based upon archaic assumptions."  *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003) (unpublished).

some of the elements of the claims are different under these theories, both require that a Plaintiff show that gender bias was a source of the deprivation." (internal quotation marks omitted)).

Plaintiff asserts a Title IX claim under the "erroneous outcome" theory. *See* Docket No. 86 at 14. A plaintiff may demonstrate that sexual bias was a motivating factor behind an erroneous outcome through evidence such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715; *see also Ruff v. Bd. of Regents of Univ. of N.M.*, 272 F. Supp. 3d 1289, 1299 (D.N.M. 2017); *Doe v. Trustees of Boston College*, 2016 WL 5799297, at *24 (D. Mass. Oct. 4, 2016) (discussing types of evidence demonstrating gender bias at the summary judgment stage). Defendants argue that plaintiff has failed to present any evidence showing that sexual bias was a motivating factor behind DU's investigation and expulsion of plaintiff. Docket No. 68 at 12-13.[12]

Plaintiff argues that four categories of evidence preclude summary judgment in defendants' favor on his Title IX claim. *See* Docket No. 86 at 15-20. First, plaintiff contends there is evidence showing that administrators at DU had an "inherent predisposition against male students." *Id.* at 15. For example, he notes that, out of

---

[12]Because defendants focus their argument on plaintiff's failure to demonstrate gender bias, *see* Docket No. 68 at 15, and the Court finds the gender bias issue dispositive, the Court need not consider whether plaintiff has sufficiently proved the other elements of his erroneous deprivation claim. *See Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1074 (declining to "address the distinctions between the erroneous outcome and selective enforcement theories" on grounds that the gender bias element was dispositive).

thirty-five complaints of non-consensual sexual contact at DU, "every complainant except one was female, every respondent was male, and every finding of responsibility resulted in a permanent dismissal from the University." Docket No. 86 at 15; *see also* Docket No. 86-19 (chart of sexual misconduct complaints between 2011 and 2016).[13] Plaintiff further states that DU has taken measures that have substantially increased the number of sexual misconduct complaints filed by women, such as the dissemination of campus posters that encourage the reporting of sexual misconduct. *Id.* He also cites testimony by Kristin Olson indicating that "all DU cases involving penetration have resulted in expulsion, regardless of the factual circumstances." *Id.* at 16; *see also* Docket No. 86-10 at 6, 101:8-22. Finally, plaintiff points to a Title IX training in which university officials directed participants to "empower the survivor" and "communicate that you believe the survivor." Docket No. 86 at 16; Docket No. 86-21.[14]

In addition to citing evidence regarding DU's general policies and procedures

---

[13]Plaintiff states ambiguously that "[t]hese findings were affirmed by DU's 2015 Clery Report which noted 'The Title IX Coordinator will review the investigation process with the victim and option for participation in a formal Title IX investigation. If the victim wishes to move forward, the investigation will be initiated, ***resulting in a finding of responsibility***.'" Docket No. 86 at 15. Plaintiff does not offer an interpretation of this statement or explain how it supports his argument regarding DU's gender bias. Moreover, any suggestion that Title IX proceedings at DU always result in a finding of responsibility is belied by the evidence submitted by plaintiff on summary judgment, which shows that five investigations between 2011 and 2016 culminated in a finding of non-responsibility. Docket No. 86-19.

[14]Plaintiff does not expressly assert a claim based on the disparate impact of DU's disciplinary system on males. Nor could he, given that most courts to address the issue have held that Title IX does not provide a private right of action for disparate impact claims. *See, e.g.*, *Pacheco v. St. Mary's Univ.*, 2017 WL 2670758, at *14 (W.D. Tex. June 20, 2017); *see also Doe v. Columbia Coll. Chi.*, 2017 WL 4804982, at *6 (N.D. Ill. Oct. 25, 2017) (noting that "Title IX does not . . . create a private right of action for disparate impact cases").

surrounding sexual misconduct, plaintiff points to evidence purportedly showing that administrators involved in his investigation had an inherent bias toward males. For example, he cites to the deposition testimony of Jean McAllister, DU's Title IX Director, in which she used the terms "victims" and "survivors" to refer to complainants of sexual misconduct. Docket No. 86 at 16; Docket No. 86-8 at 2, 137:3-139:10 (discussing terminology used to refer to complainants and respondents). He further argues that Ms. McAllister's and Ms. Grove's work histories raise a genuine issue of fact as to their predisposition toward female complainants, citing their work on behalf of survivors of sexual assault and domestic violence. Docket No. 86 at 17. Last, plaintiff notes that two of the individuals involved in his case had personal experiences with sexual assault. *Id.* at 17.

Plaintiff's second argument, that gender bias was a motivating factor behind his dismissal from DU, centers on the investigation itself. Plaintiff contends that defendants "transmogrified the consensual sex into coerced sex" by ignoring various facts indicating that his encounter with Ms. Doe was consensual. Docket No. 86 at 18. He notes specifically that there is evidence showing that Ms. Doe initiated the sexual contact, that plaintiff and Ms. Doe engaged in intercourse multiple times and switched sexual positions, that Ms. Doe never attempted to wake plaintiff's roommate who was sleeping a few feet away, and that Ms. Doe was not physically restrained or otherwise prevented from leaving the room during the encounter. *Id.* at 18.

Third, plaintiff asserts that defendants' inherent gender bias is made evident by the fact that complainants and respondents are not given the same resources to navigate the Title IX complaint process. *Id.* at 19. He notes that the resources he was

given at the outset of the investigation were "complainant specific," and he complains

that the campus' Center for Advocacy and Prevention and Empowerment, whose

mission is to "provid[e] advocacy and support for victims of sexual assault, relationship

violence, stalking, and sexual harassment," does not serve male students accused of

sexual misconduct.  Docket No. 86 at 19.

Finally, plaintiff contends that gender bias is demonstrated by "DU's imposition of

an unwarranted and excessive sanction" in the absence of "credible evidence" or

"aggravating factors," such as allegations of physical violence or a prior history of sexual

misconduct.  *Id.* at 20.

Considering plaintiff's evidence as a whole, the Court finds that it does not

demonstrate a genuine issue of fact as to whether sexual bias was a motivating factor

behind DU's decision to discipline plaintiff.  Much of plaintiff's evidence of differential

treatment flows from the reality that the majority of complainants of sexual misconduct

are female and the majority of respondents are male.  As plaintiff notes, of the thirty-five

sexual misconduct complaints filed at DU between 2011 and 2016, all but one of the

complaints were filed by women and the vast majority of the complaints accused men of

sexual misconduct.  *See* Docket No. 86-19.  This disparity is not, however, evidence of

gender bias on the part of DU.  As other courts have observed, universities are "not

responsible for the gender makeup of those who are accused *by other students* of

sexual misconduct."  *Doe v. Univ. of Colo.*, 255 F. Supp. 3d at 1078 (quoting *King v.

DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind.  Aug. 22, 2014)).

The Court also does not find DU's efforts to encourage the reporting of sexual

misconduct and to offer support to complainants to be inherently discriminatory. *See Doe v. Columbia Coll. Chi.*, 2017 WL 4804982, at *10 (finding that sexual assault awareness policies and events were "not gender-biased and instead [were] legitimate preventative education programs and resources that OCR has explicitly instructed universities to provide for survivors and victims of all genders."). Plaintiff accuses DU of taking actions that had the direct effect of increasing the number of sexual misconduct complaints filed with the university. But not every Title IX complaint results in an investigation or a finding of responsibility. *See* Docket 86-19. Moreover, a university has no control over the number of sexual misconduct complaints actually filed, and plaintiff offers no evidence that DU's efforts purposefully encouraged the filing of complaints against men.[15] Similarly, even assuming that DU's Title IX training materials and resources indicate preferential treatment of complainants, such evidence does not, standing alone, support an inference of gender bias. *See Bleiler v. College of Holy Cross*, 2013 WL 4714340, at *12 (D. Mass. Aug. 26, 2013) (finding that gender-neutral training materials did not give rise to inference of gender bias); *Doe v. Columbia Univ.*, 831 F.3d at 57 (noting that, while allegations that university officials favored complainant's version of events "support[ed] the inference of bias, they [did] not necessarily relate to bias on account of sex"); *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1079 (granting motion to dismiss as to plaintiff's Title IX claim where "the inference of pro-victim bias [was] an obvious alternative explanation . . . overwhelm[ing]

---

[15]To support his argument, plaintiff relies on his own deposition testimony that he "believe[s] [he] saw a poster that said if you regret it, it was rape." Docket No. 86 at 15; Docket No. 86-7 at 7, 128:1-2. Even assuming plaintiff's memory is accurate, it is not clear to the Court how such a poster would give rise to an inference of gender bias.

any potential inference of gender bias").  As for plaintiff's argument regarding the resources available to complainants and respondents, there is no dispute that plaintiff received the same list of resources as Ms. Doe at the start of the investigation.  Docket No. 68 at 3-4, ¶ 10; Docket No. 68-30 at 5-8.  That some of those resources were "complainant specific" does not support an inference of gender bias.  *See Yu v. Vassar College*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015) ("That an alleged victim of sexual misconduct would receive help from a counselor cannot reasonably be seen as a marker of anti-male gender bias.").[16]

Plaintiff's attempt to demonstrate that certain university officials involved in his investigation had a predisposition against male respondents is also unavailing.  As a preliminary matter, the Court agrees that plaintiff has failed to create a genuine dispute of fact as to whether Ms. McAllister had any meaningful involvement in the investigation.  In an effort to create a factual dispute, plaintiff states that Ms. McAllister "could not recall whether she provided thoughts on the [final] report to Grove or Butler."  Docket No. 86 at 3, ¶ 24.  During the portion of her deposition cited by plaintiff, however, Ms. McAllister testified that she reviewed the final report "as a training exercise" and, if she provided any comments on the report before it was issued, those comments "would have been that it was acceptable, and thanks for letting me review it."  Docket No. 86-8 at 1, 121:22-122:16.  Because there is no indication that Ms. McAllister had any influence on

---

[16]Plaintiff focuses on the fact that the Center for Advocacy and Prevention and Empowerment ("CAPE") did not provide support to "*male* students who were accused of sexual assault."  Docket No. 86 at 19.  However, plaintiff cites no evidence that CAPE offered support to female respondents.  Additionally, Ms. Grove testified that both the Health & Counseling Center and the university chaplain were available to support those accused of sexual misconduct.  *See* Docket No. 86-1 at 21, 205:6-15.

the investigation, her "biases" are insufficient to create a genuine dispute of fact. *See*

*Mallory*, 76 F. App'x at 640 ("Without any evidence that Carpinelli influenced the voting

members to find against Mallory because of his sex, and without any indication that

Carpinelli affected the proceedings in a significant way, Mallory has not demonstrated

that a genuine issue of material fact exists with respect to his assertion of a sex-based

erroneous outcome.").

Plaintiff also attempts to raise an inference of bias on the part of Ms. Grove and

two other unidentified officials who participated in the investigation and Outcome

Council. But the fact that Ms. Grove has experience working with survivors of domestic

violence does not establish that she harbors pro-female biases. Moreover, the Court

rejects plaintiff's suggestion that an individual's personal experience of sexual assault

necessarily renders him or her biased against men, a proposition that plaintiff fails to

support.

Plaintiff's remaining arguments pertain to the investigation itself and DU's

decision to dismiss plaintiff from the university despite the absence of "credible

evidence" or "aggravating factors." Docket No. 86 at 18, 20. As to the investigation,

plaintiff contends that the investigators' failure to consider a number of facts

demonstrating the consensual nature of his encounter with Ms. Doe gives rise to an

inference of gender bias. However, many of the facts plaintiff cites are taken directly

from the investigation report, belying any assertion that the facts were not "considered"

in the course of the investigation. *See* Docket No. 86 at 18 (citing Investigation Report).

The final report further shows that the investigators considered both plaintiff's and Ms.

Doe's accounts of the incident. *See* Docket No. 67-1. That the investigators ultimately

found Ms. Doe's story to be more credible does not demonstrate that they "failed to consider" exculpatory information. Plaintiff's citation to *Doe v. Columbia University* does not alter this conclusion. The court noted in that case that, "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer . . . that the evaluator has been influenced by bias." *Doe v. Columbia Univ.*, 831 F.3d at 57. However, the court also clarified that such allegations did not "necessarily relate to bias on account of sex." *Id.* The court's ultimate finding that the complaint gave rise to a plausible inference of gender bias was predicated on additional allegations that the university had been criticized for failing to take seriously "complaints of female students alleging sexual assault by male students" and had acted in response to those criticisms. *Id.*

Finally, plaintiff contends that the fact that he was given the "harshest penalty available" in the absence of any aggravating factors or a history of sexual misconduct gives rise to an inference of discrimination. Docket No. 86 at 20. However, plaintiff offers no evidence that he was singled out for such a sanction on the basis of gender. In fact, he argues that "[a]ll DU cases involving penetration have resulted in expulsion, regardless of the factual circumstances." Docket No. 86 at 16. Absent evidence that women have received lesser sanctions for similar conduct, statements by university officials indicating the impact of gender on the severity of the penalties imposed, or "patterns of decision-making . . . tend[ing] to show the influence of gender," DU's decision to dismiss plaintiff from the university does not give rise to an inference of

gender bias.  *Yusuf*, 35 F.3d at 715.[17]

In summary, the Court finds that plaintiff has failed to demonstrate a genuine issue of material fact as to whether gender bias was a motivating factor behind defendants' actions in this case.  Although plaintiff's arguments reflect his disagreement with DU's Title IX procedures, the Court is mindful that universities have leeway in determining how to address the misconduct that occurs on their campuses.  *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (noting school administrators' "flexibility" in determining how best to address student misconduct).  The Court "should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*; *Yu*, 97 F. Supp. 3d at 462 ("To the extent that Yu simply disagrees with the [disciplinary panel's decision], the Court cannot now – absent flawed process *and* gender discrimination – second-guess the panelists' credibility determinations and factual conclusions.").  In this case, the legal theory plaintiff chose to assert required him to show that gender bias was a motivating factor behind DU's disciplinary decision. Because plaintiff has failed to make this showing, defendants are entitled to summary judgment on his Title IX claim.

## D.  State Law Claims

Plaintiff's remaining claims either arise under state law or seek a declaratory judgment.  Although the Court may exercise supplemental jurisdiction over state law

---

[17]To the extent that this argument reflects an attempt by plaintiff to assert liability under a selective enforcement theory, plaintiff has not demonstrated that "a female was in circumstances sufficiently similar to his own and was treated more favorably by the University."  *Mallory*, 76 F. App'x at 641 (discussing evidence required to support selective enforcement claim).

claims if there is a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) provides that

a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . .

the district court has dismissed all claims over which it has original jurisdiction." The

Tenth Circuit has instructed that, "if federal claims are dismissed before trial, leaving

only issues of state law," courts should "decline to exercise pendent jurisdiction . . .

absent compelling reasons to the contrary." *Brooks v. Gaenzle*, 614 F.3d 1213, 1229-30

(10th Cir. 2010) (brackets, internal citations, and internal quotation marks omitted). This

rule is consistent with "[n]otions of comity and federalism," which "demand that a state

court try its own lawsuits." *Id.* at 1230 (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th

Cir. 1995)).

Plaintiff does not argue that the Court should retain jurisdiction over his state law

claims if his federal claims are dismissed, and the Court does not find any compelling

reason to do so. Accordingly, plaintiff's third, fourth, fifth, sixth, and seventh claims for

relief will be dismissed without prejudice. *See Thompson v. City of Shawnee*, 464 F.

App'x 720, 726 (10th Cir. 2012) (unpublished) (holding that, when declining to exercise

supplemental jurisdiction over state-law claims, court "had discretion either to remand

the claims to the state court or to dismiss them"); *see also* Colo. Rev. Stat. § 13-80-111

(permitting claims properly commenced within the statute of limitations to be re-filed if

involuntarily dismissed because of lack of jurisdiction); *Artis v. District of Columbia*, 138

S. Ct. 594, 598 (2018) (holding that 28 U.S.C. § 1367(d) tolls the statute of limitations for

state law claims asserted under § 1367(a) during the pendency of the federal litigation in

which such claims are brought and for thirty days following involuntary dismissal of those

claims on jurisdictional grounds).[18]

Given the Court's disposition of plaintiff's remaining claims, and the fact that plaintiff does not rely on the expert opinions of either Aya Gruber or Hanna Stotland to support his due process and Title IX causes of action,[19] the Court need not resolve Defendants' Motion to Exclude Expert Testimony [Docket No. 117].

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 68] is **GRANTED** in part and **DENIED** in part. It is further

**ORDERED** that plaintiff's first and second claims for relief are dismissed with prejudice. It is further

**ORDERED** that plaintiff's third, fourth, fifth, sixth, and seventh claims for relief are dismissed without prejudice. It is further

---

[18]Plaintiff's claim for a declaratory judgment is neither a stand-alone cause of action nor an independent basis for federal jurisdiction. *See Cheyenne & Arapaho Tribes v. First Bank & Trust Co.*, 560 F. App'x 699, 708 (10th Cir. 2014) (unpublished) (stating that the Declaratory Judgment Act "does not confer any 'substantive rights' or create a cause of action"); *Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006) (noting that the "Declaratory Judgment Act does not extend the jurisdiction of federal courts"). Accordingly, that claim will be dismissed without prejudice along with plaintiff's state law claims.

[19]Plaintiff cites Ms. Gruber's expert report three times in his response to defendants' motion for summary judgment. *See* Docket No. 86 at 4, 23 n.6, 24. Plaintiff cites Ms. Stotland's report only once. *See id.* at 27. Although these citations highlight purported deficiencies in DU's investigative process as well as the ongoing harm suffered by plaintiff as a result of his dismissal from DU, they are not material to the Court's conclusions as to the two issues that are dispositive of plaintiff's claims in this case: (1) whether there was state action for purposes of plaintiff's due process claim; and (2) whether gender bias was a motivating factor behind plaintiff's discipline for purposes of his Title IX claim.

**ORDERED** that plaintiff's first and second motions for leave to submit supplemental authority [Docket Nos. 108, 110] are **GRANTED**.  It is further

**ORDERED** that Defendants' Motion to Exclude Expert Testimony [Docket No. 117] is **DENIED AS MOOT**.  It is further

**ORDERED** that plaintiff's Unopposed Motion to Continue Trial Date [Docket No. 150] is **DENIED AS MOOT**.  It is further

**ORDERED** that, within 14 days of the entry of this Order, defendants may have their costs by filing a Bill of Costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed.


DATED March 13, 2018.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge